IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2015 Term

**FILED**

**November 9, 2015**

**released at 3:00 p.m.**
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

No. 14-0876

STATE OF WEST VIRGINIA,
Plaintiff below, Respondent

v.

HOWARD CLARENCE JENNER,
Defendant Below, Petitioner

Appeal from the Circuit Court of Upshur County
The Honorable Kurt W. Hall, Judge
Criminal Action No. 12-F-17

CONDITIONALLY AFFIRMED PENDING
HEARING ON REMAND

Submitted: October 7, 2015
Filed: November 9, 2015

Harry A. Smith, III, Esq.
McNeer, Highland, McMunn and Varner, L.C.
Elkins, West Virginia
Attorney for Petitioner

Patrick Morrisey, Esq.
Attorney General
Benjamin F. Yancey, III, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorneys for Respondent

JUSTICE LOUGHRY delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review." Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000).

2.      "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt.  Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syl. Pt. 1,  *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

3.      "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor

i

of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syl. Pt. 3, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

4. "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998).

5. "The type of evidence that is admissible in the mercy phase of a bifurcated first degree murder proceeding is much broader than the evidence admissible for purposes of determining a defendant's guilt or innocence. Admissible evidence necessarily encompasses evidence of the defendant's character, including evidence concerning the defendant's past, present and future, as well as evidence surrounding the nature of the crime committed by the defendant that warranted a jury finding the defendant guilty of first degree murder, so long as that evidence is found by the trial court to be relevant under Rule 401 of the West Virginia Rules of Evidence and not unduly prejudicial pursuant to Rule 403 of the

West Virginia Rules of Evidence." Syl. Pt. 7, *State v. McLaughlin*, 226 W.Va. 229, 700 S.E.2d 289 (2010).

6. "'A motion for a new trial on the ground of the misconduct of a jury is addressed to the sound discretion of the court, which as a rule will not be disturbed on appeal where it appears that defendant was not injured by the misconduct or influence complained of. The question as to whether or not a juror has been subjected to improper influence affecting the verdict, is a fact primarily to be determined by the trial judge from the circumstances, which must be clear and convincing to require a new trial, proof of mere opportunity to influence the jury being insufficient.' Syllabus Point 7, *State v. Johnson*, 111 W.Va. 653, 164 S.E. 31 (1932)." Syl. Pt. 1, *State v. Sutphin*, 195 W.Va. 551, 466 S.E.2d 402 (1995).

7. "A jury verdict may not ordinarily be impeached based on matters that occur during the jury's deliberative process which matters relate to the manner or means the jury uses to arrive at its verdict." Syl. Pt. 1, *State v. Scotchel*, 168 W.Va. 545, 285 S.E.2d 384 (1981).

8. "In any case where there are allegations of any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about a matter pending

before the jury not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial with full knowledge of the parties; it is the duty of the trial judge upon learning of the alleged communication, contact, or tampering, to conduct a hearing as soon as is practicable, with all parties present; a record made in order to fully consider any evidence of influence or prejudice; and thereafter to make findings and conclusions as to whether such communication, contact, or tampering was prejudicial to the defendant to the extent that he has not received a fair trial." Syl. Pt. 2, *State v. Sutphin*, 195 W.Va. 551, 466 S.E.2d 402 (1995).

9.     "In the absence of any evidence that an interested party induced juror misconduct, no jury verdict will be reversed on the ground of juror misconduct unless the defendant proves by clear and convincing evidence that the misconduct has prejudiced the defendant to the extent that the defendant has not received a fair trial." Syl. Pt. 3, *State v. Sutphin*, 195 W.Va. 551, 466 S.E.2d 402 (1995).

iv

LOUGHRY, Justice:

The petitioner, Howard Clarence Jenner, appeals his convictions for first degree murder[1] without a recommendation of mercy, attempted murder,[2] and malicious wounding.[3] As support for his appeal, he argues that the State presented insufficient evidence to support the convictions, that the circuit court admitted unfairly prejudicial evidence during the "mercy phase" of his bifurcated trial, and that juror misconduct occurred during trial.[4] After a thorough review of the appendix record on appeal, the parties' arguments, and the pertinent law, we find that the evidence at trial was sufficient to convict the petitioner; that there was no evidentiary error during the mercy phase; and that the petitioner failed to prove misconduct with regard to an alleged pre-deliberation conversation among jurors. However, because the circuit court abused its discretion by restricting the petitioner's opportunity to attempt to prove that a juror communicated with the surviving victim during trial recesses, we remand this case for an additional post-trial hearing on that single issue.

---

[1]W.Va. Code § 61-2-1 (2014).

[2]W.Va. Code §§ 61-11-8, 61-2-1 (2014).

[3]W.Va. Code § 61-2-9(a) (2014).

[4]The petitioner also raises a fourth assignment of error, contending in a very general fashion that the trial court erred by denying his post-trial motions. Because this assignment of error merely duplicates the other assignments of error discussed herein, we will not address it separately.

1

## I.  Factual and Procedural Background

At approximately 4:00 p.m. on December 22, 2011, Beni Truax was shot and killed while in the yard of her Upshur County home.  One bullet entered her lower back and another bullet struck the right side of her head, traveling back to front.  Her husband, Sherman Truax, testified he was sleeping in a recliner inside of the home when the sound of a gunshot awakened him.  As he was standing up from his chair, he heard another shot.  Mr. Truax walked out of the house and saw his wife lying face-down and motionless on the ground.  He then saw a man step from behind a parked truck holding a rifle outfitted with a large scope.  Mr. Truax immediately recognized this man as his nephew, the petitioner herein.  Mr. Truax testified that the petitioner aimed the rifle at him, compelling Mr. Truax to turn and run toward the door of his home.  The assailant fired the rifle, striking Mr. Truax's right wrist and causing serious injury.

Inside his home, Mr. Truax wrapped a towel around his badly bleeding wrist and called 911.  When police arrived, he identified the petitioner as the shooter.  In addition to the family relationship, Mr. Truax was familiar with the petitioner's appearance because, two years earlier, the petitioner had lived in the Truax home for several months.  Mr. Truax also pointed police in the direction that he believed the petitioner had fled on foot.  The police found evidence that a person had run through a muddy area, but they lost the assailant's trail.

2

At approximately 11:00 that night, the police encountered the petitioner, who was wet and muddy, walking along a nearby roadway. He was arrested and taken to a police station, where he gave a statement. Initially, the petitioner told the police that he had been hunting in the woods, stopped to rest, and fell asleep. He volunteered to the police that he had a rifle, but claimed that somebody stole it while he was sleeping. The petitioner denied being near the Truaxes' home, but then changed his story and said that he had been hunting near their home. Later in the statement, he changed his story again to claim that Mr. Truax had fired upon him and he had returned fire only in self-defense, accidentally shooting Mrs. Truax. The petitioner also admitted to police that he was angry with the Truaxes because two years earlier they had thrown him and his mother out of their home. He then led police to where he had disposed of his rifle in a swampy area near the victims' home.

The evidence at trial showed that the petitioner traveled from Tennessee to Upshur County, West Virginia, approximately one week before the crimes. Four days before the shootings, on the early morning of December 18, 2011, the petitioner called a taxi that transported him to the Number Five Mine Road off of Hacker's Creek Road, where he arrived at 4:48 a.m. This location is near the Truaxes' home on Hacker's Creek Road. Later that morning, at around 10:00 a.m., the petitioner went to the Buckhannon Wal-Mart where he purchased his rifle, a telescopic sight, and some ammunition. The rifle uses .243 caliber Winchester shells, the same caliber as two empty shell casings found near Mrs. Truax's body.

3

On the evening of December 18, the petitioner took a taxi to a sporting goods store where he had a salesperson demonstrate how to use his new rifle and scope. The petitioner practiced shooting the rifle at the store's indoor firing range.

At the April 2014 trial, the jury found the petitioner guilty of the first degree murder of Mrs. Truax and the attempted murder and malicious wounding of Mr. Truax. The trial proceeded to a bifurcated "mercy phase," during which the defense presented expert testimony from psychologist Dr. Robert Jeffrey Rush and from the petitioner's sister, Elizabeth Grindstaff. Dr. Rush provisionally diagnosed the petitioner with schizoid personality disorder and explained that the petitioner is a "loner" with low-average intelligence who, among other traits, has great difficulty perceiving the world the way other people do, tends to ruminate, and loses himself in the fantasy world of video gaming. Ms. Grindstaff offered that her brother is very loving, is both emotionally and financially supportive of her and her children, and that she has never witnessed him displaying anger or demonstrating a propensity toward violence.

The State presented three witnesses during the mercy phase of the trial. Sherman Truax and his son, Nicholas, each testified about the impact these crimes had upon them. Also, a police officer authenticated a photograph and a video game, both of which were admitted into evidence over the petitioner's objection. The photograph showed that

4

when arrested on the night of the shootings, the petitioner was wearing a t-shirt printed with the following words: "May God have mercy on my enemies because I sure as hell won't." The shirt also depicted two skulls and crossbones. A police officer testified that the video game, "Assassin's Creed Revelations," was found in the backpack that the petitioner had been carrying in the days leading up to the crimes. The officer read the description on the back of the game:

> Two assassins, one destiny. I have always lived by the creed.
> My blades have dispensed death and justice in equal measure,
> yet I am no closer to discovering the truth behind our order, so
> I must walk the path of my ancestor, Apilia, in his footsteps I
> will find my true purpose.

After hearing additional argument from counsel and engaging in further deliberations, the jury did not recommend mercy. On May 30, 2014, the petitioner filed two separate post-trial motions. One motion sought a judgment of acquittal or, in the alternative, a new trial based on insufficiency of the evidence to support the convictions and trial error. The other motion sought a new trial because of alleged juror misconduct. On June 11, 2014, the petitioner filed a motion asking the circuit court to allow him to subpoena both the trial jurors and alternate jurors to testify at the post-trial motions hearing. The court permitted the petitioner to subpoena two jurors and one alternate juror whom the petitioner alleged committed misconduct.

5

At the post-trial hearing held on August 4, 2014, the petitioner's counsel presented testimony from the petitioner's sister, Ms. Grindstaff, and his mother, Mary Branham. They asserted that during multiple recesses in the trial, they observed Sherman Truax outside of the courthouse, smoking along side of, and talking with, a woman whom they later learned was a juror for the petitioner's case. Based on their descriptions, the defense counsel identified the juror by name, Diana Crites. Ms. Grindstaff and Ms. Branham testified they did not realize this person was a juror until they were allowed into the courtroom to hear the verdict and saw her on the jury panel; before that, they had been sequestered outside of the courtroom. Ms. Grindstaff also asserted that on the first day of trial, Nicholas Truax was present during a smoking break with his father and this juror. In their hearing testimony, Ms. Grindstaff and Ms. Branham described the female smoker's appearance and the specific places where they saw her and Mr. Truax standing. Both admitted, however, that they had not overheard any conversations. Contending that these interactions constituted an improper extrinsic influence on Juror Crites, the petitioner argued that he was denied a fair trial.

During this post-trial hearing, the State presented testimony from Laura Queen, a victim advocate employed in the prosecutor's office. Her job includes assisting and escorting victims around the courthouse during trial. She testified that on the first day of trial she saw Mr. Truax outdoors smoking and talking with friends, but she knew that these people

6

were *not* jurors. This was the only such break Ms. Queen observed Mr. Truax take. She never saw Mr. Truax talk to any juror and, other than the times he was present to testify, she did not observe him at the courthouse at all. She explained that on the first day of trial, shortly after they testified, Sherman and Nicholas Truax left the courthouse to fix a problem with their car. Ms. Queen did not recall seeing Mr. Truax at the courthouse on the second day of trial and, on the third day, he was not called to the courthouse until the afternoon. Countering, the petitioner observed that Mr. Truax was present at the courthouse on the first, second, and fourth days of trial because he testified on each of those days.

In addition, Ms. Grindstaff reported that during a break in the trial, she overheard a man and a woman talking in the courthouse hallway. She reported that the man said he was tired and had not slept well, to which the woman suggested that he "call off" work that night. According to Ms. Grindstaff's testimony, the man then said, "[w]ell, it just depends on how long we're here" and the woman responded, "[w]ell, maybe we won't be here long unless–that is, unless you're still undecided." Ms. Grindstaff says that when she later entered the courtroom, she saw the man sitting in the jury box. Based upon Ms. Grindstaff's descriptions, defense counsel identified the man as Juror Edward Zickefoose and the woman as an alternate juror, Samantha Ryan, who was excused prior to deliberations. The petitioner contends that the jurors must have been discussing the verdict prematurely.

7

The circuit court denied the petitioner's request to take testimony from Jurors Crites and Zickefoose and Alternate Juror Ryan, ruling that the petitioner had not proven misconduct and the court was "not going to start bringing in jurors . . . after each and every verdict" to inquire whether anybody said anything. The court explained, "that's not going to be a new review process of Court verdicts[.]"

After considering the testimony given during the post-trial hearing, the court concluded that the petitioner had not presented clear and convincing evidence of any juror misconduct. With regard to the alleged contact during smoking breaks, the court found that the only thing proven was "perhaps an opportunity for jurors to meet with Mr. Truax[.]" However, the court doubted that the contacts had even occurred. The court questioned the credibility and motivation of Ms. Grindstaff and Ms. Branham, both because of their close familial relationship with the petitioner and because they claimed that these contacts occurred during every break throughout the trial.[5] The court said, "I find it incredible that each and every time the Court recessed, that these witnesses observed Mr. Truax talking to the same juror, I just don't–the empirical odds . . . are against that . . . I find it suspect[.]"

---

[5]The record reflects that breaks were routinely taken at mid-morning, lunch, and mid-afternoon during the four-day trial.

The court was also unconvinced that the petitioner proved any misconduct with regard to the alleged discussion between jurors in the hallway. The court found that even if this discussion took place, it was unclear when it occurred and there was no proof that the conversation pertained to the verdict. The court reasoned that the jurors may have been referencing the court's practice of consulting them about when to take breaks and how late the trial would run each day. Accordingly, the court concluded that there was not clear and convincing evidence that the jurors had begun deliberating prematurely.

After finding no merit to the petitioner's remaining claims–insufficient evidence and trial error–the circuit court denied the petitioner's post-trial motions and proceeded to sentencing. By written order entered on August 6, 2014, the petitioner was sentenced to life in prison without the possibility of parole for first degree murder, plus a consecutive three to fifteen years in prison for attempted murder. A sentence of two to ten years in prison for malicious wounding was ordered to run concurrently with the attempted murder sentence. This appeal followed.

## II. Standard of Review

The petitioner's case is before this Court on appeal from the circuit court's denial of his motions for a new trial and judgment of acquittal. We apply the following standard when reviewing a circuit court's decision denying a motion for new trial:

9

In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000). Furthermore, "[t]he Court applies a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence." *State v. Juntilla*, 227 W.Va. 492, 497, 711 S.E.2d 562, 567 (2011) (citing *State v. LaRock*, 196 W.Va. 294, 304, 470 S.E.2d 613, 623 (1996)). With these general standards in mind, we turn to the assignments of error.

## III. Discussion

### A. Sufficiency of the Evidence

The petitioner argues that the circuit court should have granted his motion for judgment of acquittal because the evidence at trial was insufficient to support the jury's guilty verdicts. The State responds that the evidence was more than sufficient to convict the petitioner of all three charges.

In addition to the general standards of review set forth above, this Court engages in the following analysis when reviewing sufficiency of the evidence claims:

10

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. Pt. 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). Moreover, a criminal defendant takes on a difficult burden when seeking to prove such a claim:

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

*Id.* at 663, 461 S.E.2d at 169, syl. pt. 3. As discussed herein, our review of the appendix record leads us to conclude there was sufficient evidence to support these convictions.

Insinuating that Mr. Truax's identification of him as the shooter was incorrect, the petitioner cites to three portions of Mr. Truax's report to police and 911. First, Mr. Truax told police that the shooter wore blue jeans and a black hoodie, but the petitioner was

11

arrested wearing insulated coveralls over a dark t-shirt. Because the petitioner was arrested some seven hours after the crimes, leaving time for him to remove the hoodie and put on the coveralls, this attempt to suggest an improper identification fails. Moreover, the petitioner admitted to police that he was at the victims' home and had fired his rifle, and Mr. Truax was extremely familiar with the petitioner's appearance based upon their family relationship and the petitioner's former residence in the Truax home.

Second, the petitioner points out that Mr. Truax mistakenly reported to 911 that both his wife and his son had been shot. His teenaged son, Nicholas, arrived safely home from school a few minutes later, while Mr. Truax was still talking to the 911 operator. We fail to see how this mistake assists the petitioner's argument in any way. The inclusion of Nicholas in the report is easily explained by the fact that Mr. Truax was anxious about his family's safety, and his son was due home momentarily.

Third, the petitioner argues that Mr. Truax reported more than two shots being fired, but only two empty shell cartridge casings were found in the victims' yard. This argument is unpersuasive because other evidence proves that at least three shots were fired. Mrs. Truax had two separate wounds in her body, and Mr. Truax suffered a wound to the wrist. Moreover, when the police recovered the petitioner's rifle, there was a fired cartridge casing still inside.

12

As additional grounds for challenging the sufficiency of the evidence to support his conviction, the petitioner argues that there was no gunshot residue found on his face and hands. However, the petitioner was walking outside in the rain and, as the State's expert forensic analyst explained, gunshot residue washes away. He also complains that the State failed to provide any analyses of his laptop computer and cellular telephone, and failed to take footprint impressions or photographs of footprints at the scene of the crimes. The petitioner does not explain how these investigatory steps would have impacted the case.

Next, the petitioner asserts that the State did not prove his rifle was the murder weapon and made "no effort to determine whether the shell casings found near" Mrs. Truax's body were fired from his rifle. These contentions are belied by the record evidence. There were multiple indications that the petitioner's rifle was the weapon used in these crimes. Fired cartridge casings found in the Truaxes' yard are of the same caliber used by the petitioner's rifle, and the rifle's appearance matches the description given by Mr. Truax. The petitioner even led police to where he had dropped his rifle near the victims' home. Additionally, a State Police Lab firearms expert determined that a bullet taken from Mrs. Truax's body was in the .24 caliber family, which includes .243 Winchester, the type of ammunition used by the petitioner's rifle. Because exposure to moisture had caused rust to develop inside the rifle's chamber, the expert was unable to conclusively determine that the bullet removed from Mrs. Truax's body was fired from the rifle. However, the expert found

13

several characteristics in common between the marks left on that bullet and on a bullet she test-fired from the petitioner's rifle. Finally, the petitioner admitted to police that he had discharged his rifle at the Truaxes, although he claimed it was in self-defense.

Lastly, the petitioner contends that the State did not explain a twenty-seven minute gap in the audio recording of his statement to police. Two police officers testified that, for unknown reasons, the digital recorder had simply stopped recording. This issue pertains to the credibility of the petitioner's statement. The jury was made aware of the missing twenty-seven minutes and could attribute whatever weight it deemed appropriate to the petitioner's admissions.[6]

The petitioner's pre-dawn visit to the area four days before the shooting, the purchase of the rifle, and his presence in the area of the Truax home while armed with a loaded rifle, show premeditation and deliberation. His admitted anger with his aunt and uncle suggests a motive. Furthermore, he was positively identified by Mr. Truax, he admitted being in the yard and shooting his rifle at the Truaxes, and he led police to where he disposed of the rifle. Accordingly, there was no error in the circuit court's denial of the motion for judgment of acquittal.

---

[6]Although the petitioner moved the circuit court to suppress his entire statement, he does not raise any assignment of error on appeal regarding its admissibility.

14

**B. T-Shirt Photograph and Video Game**

The petitioner asserts that the circuit court erred by admitting two items of evidence during the bifurcated mercy phase of his trial: the photograph of the t-shirt he was wearing on the night of the shootings, and his "Assassin's Creed" video game. Arguing that neither the message on the t-shirt or the video game had anything to do with the crimes, and that both were extremely inflammatory to the jury, the petitioner contends their admission violated Rule 403 of the West Virginia Rules of Evidence: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" W.Va. R. Evid. 403, in part.[7] The State responds that this evidence was probative of the petitioner's character, which was at issue during the mercy phase, and that the evidence was not unfairly prejudicial given the violent, premeditated nature of these crimes. Moreover, because the evidence was only admitted during the bifurcated mercy phase, the State explains that it could not have impacted the jury's determination of guilt.

"A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998). With regard to evidence in the mercy phase, we have held the following:

---

[7]This opinion quotes the version of Rule 403 in effect at the time of trial. Stylistic changes, immaterial to the issues on appeal, have since been made to the rule.

15

The type of evidence that is admissible in the mercy phase of a bifurcated first degree murder proceeding is much broader than the evidence admissible for purposes of determining a defendant's guilt or innocence. Admissible evidence necessarily encompasses evidence of the defendant's character, including evidence concerning the defendant's past, present and future, as well as evidence surrounding the nature of the crime committed by the defendant that warranted a jury finding the defendant guilty of first degree murder, so long as that evidence is found by the trial court to be relevant under Rule 401 of the West Virginia Rules of Evidence and not unduly prejudicial pursuant to Rule 403 of the West Virginia Rules of Evidence.

Syl. Pt. 7, *State v. McLaughlin*, 226 W.Va. 229, 700 S.E.2d 289 (2010).

Having reviewed the appendix record, we find no abuse of discretion in the trial court's admission of the t-shirt photograph and the video game during the mercy phase. At this stage of the bifurcated trial, the jury was permitted to consider evidence of the petitioner's character. *Id.* Given the ruthless nature of these crimes, the message on the t-shirt worn on the very night of these crimes was probative of the petitioner's character. He was angry at his aunt and uncle for throwing him and his mother out of their home, and he showed no mercy when he shot his aunt in the back and later shot his fleeing uncle. Furthermore, prior to the State's admission of the video game, the petitioner's expert witness had already testified that the petitioner "loses himself in the fantasy world of . . . video gaming[.]" Defense counsel was permitted to argue to the jury that these items bore no connection to the shootings. We simply cannot conclude that this evidence was unduly

16

prejudicial. Finally, even if we were to find error in the admission of this evidence, it would be harmless. The other evidence presented to the jury, in both phases of the trial, is more than sufficient to support the recommendation against mercy.

## C. Alleged Juror Misconduct

After trial, the petitioner raised two separate allegations of juror misconduct. The petitioner's sister testified that she overheard a conversation in the courthouse hallway where, in reference to how long the jurors anticipated being in court that day, Alternate Juror Ryan told Juror Zickefoose that they might not be there long "unless . . . you're still undecided." In addition, the petitioner's sister and mother asserted that they observed Juror Crites interacting with Sherman Truax while smoking cigarettes during trial recesses. The petitioner's sister testified that Nicholas Truax was also present with his father and the juror for at least one of these breaks. Although the petitioner's sister and mother indicated their belief that Mr. Truax and Juror Crites spoke to one another, they did not overhear any conversation.[8]

The petitioner contends that the jurors' conduct in these situations was in direct violation of the circuit court's instructions[9] and, more importantly, denied him his

---

[8]The allegations are set forth more fully in section I of this opinion.

[9]The trial transcript reflects that the circuit court instructed the jury not to begin deliberations until after they had heard all of the evidence, arguments of counsel, and

17

constitutional right to a trial by an impartial jury. The State argues that after holding a

hearing on these allegations, the circuit court correctly found the petitioner did not prove the

occurrence of any juror misconduct.

Before examining the circuit court's rulings on each of these claims, we note

that a party seeking a new trial based on juror misconduct must prove the allegation by clear

and convincing evidence:

> "A motion for a new trial on the ground of the
> misconduct of a jury is addressed to the sound discretion of the
> court, which as a rule will not be disturbed on appeal where it
> appears that defendant was not injured by the misconduct or
> influence complained of. The question as to whether or not a
> juror has been subjected to improper influence affecting the
> verdict, is a fact primarily to be determined by the trial judge
> from the circumstances, which must be clear and convincing to
> require a new trial, proof of mere opportunity to influence the
> jury being insufficient." Syllabus Point 7, *State v. Johnson*, 111
> W.Va. 653, 164 S.E. 31 (1932).

Syl. Pt. 1, *State v. Sutphin*, 195 W.Va. 551, 466 S.E.2d 402 (1995). As this same point of law

recognizes, this Court applies an abuse of discretion standard of review to the trial court's

decision with regard to a motion for new trial asserting juror misconduct. *Id.*

---

instruction on the law and they were together as a jury. The court also instructed the jurors
that during recesses, they were not permitted to talk about the case with anybody.

### 1. Alleged Conversation Among Jurors in Hallway

The petitioner argues that the conversation Ms. Grindstaff reportedly overheard between Alternate Juror Ryan and Juror Zickefoose proves that the jury was prematurely deliberating on the case, in violation of the trial court's instructions. After reviewing the transcript of the post-trial hearing, we agree with the circuit court's conclusion that the petitioner has not proven any misconduct on this issue. As the circuit court found, even assuming, arguendo, that the conversation took place, it is far from clear that the jurors were discussing the case or the verdict. Ms. Grindstaff explained that the conversation concerned Juror Zickefoose being tired and whether he should "call off" work that night, so the reference to being "undecided" could have easily pertained to Juror Zickefoose's indecision about his work plans.

To support his argument, the petitioner asserts that the jury's deliberations in both the guilt and mercy phases of the trial were short in duration. He contends that this brevity is proof that juror misconduct must have occurred. We disagree. The length of jury deliberations is necessarily indeterminate. The brief period of deliberations in this case could signify that the jury found overwhelming evidence of guilt not justifying the possibility of parole. Moreover, a challenge to the length of jury deliberations constitutes an intrinsic challenge to a verdict that we will not entertain. "A jury verdict may not ordinarily be impeached based on matters that occur during the jury's deliberative process which matters

19

relate to the manner or means the jury uses to arrive at its verdict." Syl. Pt. 1, *State v. Scotchel*, 168 W.Va. 545, 285 S.E.2d 384 (1981). After reviewing the record in this case, we conclude that the circuit court did not abuse its discretion when denying the motion for new trial based on the alleged conversation in the hallway.

### 2. Alleged Interaction While Smoking

Turning to the petitioner's other assertion of jury misconduct, it is well-settled that when a juror allegedly engages in a private communication with a third party about the matter on trial, the trial court is required to hold a hearing and consider the claim:

> In any case where there are allegations of any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about a matter pending before the jury not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial with full knowledge of the parties; it is the duty of the trial judge upon learning of the alleged communication, contact, or tampering, to conduct a hearing as soon as is practicable, with all parties present; a record made in order to fully consider any evidence of influence or prejudice; and thereafter to make findings and conclusions as to whether such communication, contact, or tampering was prejudicial to the defendant to the extent that he has not received a fair trial.

*Sutphin*, 195 W.Va. at 553-54, 466 S.E.2d at 404-05, syl. pt. 2. Similarly, the United States Supreme Court held that when there has been alleged prohibited contact with a juror, the trial court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate."

20

*Remmer v. United States*, 347 U.S. 227, 230 (1954). "[T]he remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982). This hearing, commonly referred to as a "*Remmer* hearing," was held by the circuit court herein when considering the petitioner's post-trial motions.

During a *Remmer* hearing, the person seeking a new trial must prove, by clear and convincing evidence, that improper influence on a juror occurred and affected the verdict. *See Sutphin*, 195 W.Va. at 553, 466 S.E.2d at 404, syl. pt. 1 (quoted above). Proof of the mere opportunity to influence the jury is insufficient to warrant a new trial. *Id.* We recently emphasized that "the mere allegation of juror misconduct is insufficient to warrant a new trial. . . . [There] must be proof that some improper event has occurred. Misconduct on the part of the jury as grounds for a new trial is not presumed but must be fully proved by the moving party." *State v. Trail*, __ W.Va. __, __ S.E.2d __, 2015 WL 5928478, slip op. *10 (W.Va. Oct. 7, 2015) (citation and internal quotation marks omitted). Furthermore,

> due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences

21

> when they happen.  Such determinations may properly be made at a hearing like that ordered in *Remmer*[.]

*Id.,* slip op. * 16 (quoting *Smith*, 455 U.S. at 217).

If the moving party proves that some improper event involving a juror did occur, the trial court must then determine whether that event affected the juror to the prejudice of the moving party.  In that regard, we have held that

> [i]n the absence of any evidence that an interested party induced juror misconduct, no jury verdict will be reversed on the ground of juror misconduct unless the defendant proves by clear and convincing evidence that the misconduct has prejudiced the defendant to the extent that the defendant has not received a fair trial.

*Sutphin*, 195 W.Va. at 554, 466 S.E.2d at 405, syl. pt. 3.  If, however, the juror misconduct was induced or participated in by an interested party, prejudice will be presumed and must be rebutted.  *Legg v. Jones*, 126 W.Va. 757, 763, 30 S.E.2d 76, 80 (1944); *State v. Daniel*, 182 W.Va. 643, 647, 391 S.E.2d 90, 94 (1990); *Sutphin*, 195 W.Va. at 559-60, 466 S.E.2d at 410-11; *Bluestone Indust., Inc. v. Keneda*, 232 W.Va. 139, 143, 751 S.E.2d 25, 29 (2013).  Ultimately, if the court concludes that there was prejudicial juror misconduct, a new trial is warranted.  *Legg*, 126 W.Va. at 757, 30 S.E.2d at 77, syl. pt. 3 ("Misconduct of a juror, prejudicial to the complaining party, is sufficient reason . . . to set aside a verdict returned by the jury of which he is a member.").

22

In both *Trail* and *Sutphin*, there was no question that a juror had, in fact, conversed with a non-juror about the trial. Those cases focused on the issue of prejudice, including whether the juror was induced to commit misconduct by an interested party such that prejudice is presumed. By contrast, following the *Remmer* hearing held in the case at bar, the circuit court found that the petitioner failed to establish by clear and convincing evidence that any misconduct had even occurred. The judge expressed doubt about the credibility and motivation of Ms. Grindstaff and Ms. Branham. Not only are they close family members of the petitioner, they asserted so many instances of misconduct that the court found their claims to be suspect. The court concluded that, at most, the petitioner established the mere opportunity to influence a juror which, under *Johnson* and *Sutphin*, is insufficient to prove juror misconduct. *Johnson,* 111 W.Va. at 654, 164 S.E. at 32, syl. pt. 7; *Sutphin*, 195 W.Va. at 553, 466 S.E.2d at 404, syl. pt. 1.

However, under the particular circumstances of this case, where two witnesses provided sworn, detailed testimony claiming to have seen the victim and a juror socializing with one another over the course of multiple days of trial, we are concerned that the circuit court rejected the allegations without hearing from any of the people who allegedly engaged in the conduct: Juror Crites, Sherman Truax, and, to a lesser extent, Nicholas Truax. *Sutphin* requires a "full consider[ation]" of the evidence pertaining to alleged juror misconduct. 195 W.Va. at 553-54, 466 S.E.2d at 404-05, syl. pt. 2. While the circuit court may have been

23

correct in finding that no misconduct occurred, we are unable to confirm this conclusion from the record before us. Furthermore, Rule 606(b)[10] of the West Virginia Rules of Evidence expressly permits limited testimony from a juror on the issue of improper outside influence or extraneous prejudicial information. Although the petitioner subpoenaed Juror Crites to the post-trial hearing and asked to take her testimony, the circuit court refused to allow it.

*United States v. Brantley*, 733 F.2d 1429 (7th Cir. 1984), is instructive. In *Brantley*, the co-defendants, who were convicted of drug-smuggling offenses, moved for a

---

[10]Rule 606(b) of the West Virginia Rules of Evidence, as it was written at the time of the petitioner's post-trial hearing in August of 2014, provided as follows:

> (b) *Inquiry into validity of verdict or indictment.* – Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, *except that a juror may testify on the question [of] whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.* Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter upon which the juror would be precluded from testifying be received for these purposes.

*Id.* (emphasis added.) Effective September 2, 2014, this Court amended Rule 606 to improve its organization and clarity, but those changes are immaterial to the issues in this appeal.

new trial arguing that an improper extrinsic influence on the jury had denied them a fair trial. Reportedly, one juror, Angela Blige, had told the other jurors that she personally knew Co-Defendant James Murray's daughter and thus knew that Murray had "been in this kind of trouble before." *Id.* at 1439. Although the trial judge held hearings on the claim of juror misconduct, the judge conducted his own inquiry of Juror Blige, refusing to allow counsel for the parties to question her, and did not allow testimony from other jurors who may have been impacted by the statement. *Id.* Based on this review, the trial court concluded that the co-defendants failed to prove their allegation of jury misconduct. *Id.* On appeal, the Seventh Circuit Court of Appeals recognized that "[a] party claiming that an improperly influenced jury returned a verdict against him must be given an opportunity to prove that claim." *Id.* (citation and internal quotation marks omitted). The appellate court ultimately concluded that the trial court had abused its discretion by conducting an insufficient investigation into the allegation. *Id.* at 1440. Finding no other error, the appellate court conditionally affirmed Murray's conviction but remanded the case back to the trial court for a more complete hearing on the juror misconduct claim. *Id.* at 1441.

We conclude that in the case at bar, the circuit court abused its discretion by denying the petitioner's motion for a new trial without permitting him to elicit testimony from Juror Crites on the limited issue of any communication she may have had with the Truaxes during trial. By refusing to allow this requested testimony, the circuit court unduly

restricted the petitioner's opportunity to prove his claim of juror misconduct. The serious and detailed nature of these allegations warrant a *Remmer* hearing where the persons alleged to have committed the misconduct are allowed to participate.[11]

Accordingly, we remand this case to the circuit court for an additional post-trial *Remmer* hearing. The circuit court is directed to permit the petitioner to subpoena and take sworn testimony from Juror Crites regarding any communication she may have had with the Truaxes during trial recesses. Moreover, either party shall also be permitted to subpoena and take sworn testimony on this issue from Sherman and Nicholas Truax. If the evidence on remand confirms the circuit court's previous conclusion that no jury misconduct was proven, then the circuit court should reaffirm its denial of the motion for new trial. However, if on

---

[11]We must emphasize that not every allegation of juror misconduct requires that the challenged juror be called to testify. The decision on whether to hear juror testimony depends on the facts and the accusations, and how well the accusations are supported by the moving party. The Eleventh Circuit Court of Appeals surveyed decisions from various federal courts and determined that the cases

> fall along a continuum focusing on two factors. At one end of the spectrum the cases focus on the certainty that some impropriety has occurred. The more speculative or unsubstantiated the allegation of [juror] misconduct, the less the burden to investigate. . . . At the other end of the continuum lies the seriousness of the accusation. The more serious the potential jury contamination, especially where alleged extrinsic influence is involved, the heavier the burden to investigate.

*United States v. Caldwell*, 776 F.2d 989, 998 (11th Cir. 1985) (citations omitted).

26

remand the circuit court finds clear and convincing evidence that juror misconduct occurred, the circuit court must then determine whether there was prejudice that warrants a new trial.

In summary, we find that there was sufficient evidence to support the petitioner's convictions, and we find no merit to his claims of trial error. However, we conditionally affirm the petitioner's conviction based on our limited remand of this case to the circuit court for an additional *Remmer* hearing, as discussed herein. *See Brantley*, 733 F.2d at 1441 (conditionally affirming criminal conviction subject to remand hearing to review issue of juror misconduct); *State v. Bibb*, 626 So.2d 913 (La. Ct. App. 1993) (same); *cf.* Syl. Pt. 1, *Perrine v. E.I. Du Pont De Nemours and Co.*, 225 W.Va. 482, 694 S.E.2d 815 (2010) (conditionally affirming civil case, in part, subject to outcome of hearing on remand regarding statute of limitations).

### IV.  Conclusion

For the reasons set forth above, the petitioner's conviction is conditionally affirmed. The matter is remanded to the circuit court for an additional *Remmer* hearing pursuant to the directions set forth herein.

**Conditionally affirmed; remanded for hearing.**

27