711 S.E.2d 562

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Anthony Charles JUNTILLA, Defendant Below, Appellant.**

No. 35739.

Supreme Court of Appeals of West Virginia.

Submitted April 13, 2011.

Decided May 17, 2011.

Christopher J. Prezioso, Esq., Luttrell & Prezioso, PLLC, Martinsburg, WV, for Appellant.

Christopher C. Quasebarth, Esq., Chief Deputy Prosecuting Attorney for Berkeley County, Martinsburg, WV, for Appellee.

PER CURIAM:

This case is before the Court upon the appeal of Anthony Charles Juntilla from the December 1, 2009, Agreed Re-sentencing Order, wherein the Circuit Court of Berkeley County, West Virginia, denied the Appellant's post-trial motions and sentenced him to life in prison without the possibility of parole based upon a jury conviction of first degree murder without a recommendation of mercy; fifteen to thirty-five years in prison for a jury conviction of sexual assault in the first degree; and one to five years in prison for a jury conviction of conspiracy to commit sexual assault. The circuit court ordered the sentences to run consecutively. The Appellant argues that the circuit court erred: 1) in failing to grant a judgment of acquittal at the close of the Appellee's case-in-chief and again

at the close of all the evidence; 2) in allowing the Appellant's statement given on March 13, 2008, to be admitted into evidence; 3) in denying the Appellant's motion to strike a prospective juror, David Smallwood, because of bias; and 4) in allowing the jury in a unitary first degree murder trial to decide the issue of mercy without setting forth any appropriate standards.[1] Based upon a review of the parties' briefs and arguments, the record, and all other matters submitted before the Court, the Court affirms the decision of the circuit court.

### I. Facts and Procedural History

This case arises from the sexual assault and murder of T. S.,[2] which occurred on the evening of May 26 or the early morning of May 27, 2007. At the time of the murder, Stephanie Brennan was the Appellant's girlfriend. Ms. Brennan had a one-year-old child[3] with the Appellant and resided with the Appellant in his father's home in Hedgesville, West Virginia. She testified that she was in a drug rehabilitation facility from May 15, 2007, until she successfully completed the program on June 5, 2007.

Ms. Brennan testified that on June 5, before picking her up from the drug rehabilitation facility, the Appellant told her during a phone conversation that he had done something bad, stating to her "think Hannibal Lector." When the Appellant picked her up from the rehabilitation facility later that day, the Appellant told her that over Memorial Day weekend, he and a man named Fred had picked up a girl in Martinsburg, West Virginia. They took the girl to the Appellant's house where they raped her, killed her, bleached the body, and then dumped the body near Dam 4 on the Potomac River. Specifically, the Appellant told Ms. Brennan that he hit the girl in the head, bashed her head into the wall, and then carried her upstairs to the bathtub, where he stabbed her to death. The Appellant told Ms. Brennan that he poured bleach down her throat and into her vagina to destroy the evidence. The Appellant said that he and Fred took the girl's body and put it into a blue tote before taking the body out to Dam 4. Ms. Brennan testified that she did not know Fred, who was described to her by the Appellant as a white male who looked like Eminem.

For approximately two and a half weeks after the Appellant's revelations to Ms. Brennan, she remained in the Appellant's father's house. She testified that the home smelled of cleaning supplies. She also testified that she could not find a knife that had been in the kitchen. She stated that she noticed two places on the sofa that the Appellant told her he had cleaned, in addition to an indentation in the wall. Ms. Brennan decided to tell the Appellant's brother, David Juntilla, what the Appellant had told her. The Appellant's brother called the police.

On June 17, 2007, Trooper John Bowman of the West Virginia State Police went to the Appellant's father's home as part of a murder investigation. Trooper Bowman testified that he met Ms. Brennan and the Appellant's brother at the home. Ms. Brennan relayed the Appellant's story about the Memorial Day weekend murder to the trooper. The police began an investigation; however, an initial search of the area around Dam 4 revealed nothing.

Based upon Ms. Brennan's description, the police determined that the individual identified by the Appellant as Fred was Fred Douty. The police located Mr. Douty and questioned him. Mr. Douty admitted to the police that he had been with the Appellant, Charmone Myers, and two other people during Memorial Day weekend. While Mr. Dou-

---

1. The Appellant also assigned as error in his initial petition that his due process rights were being violated because West Virginia did not have mandatory appellate review for defendants sentenced to life without mercy. The Appellant, in his brief, concedes that this issue was moot because of the West Virginia Revised Rules of Appellate Procedure and because the Court accepted his petition. The Court agrees with the Appellant's concession that the issue is moot. W. Va. Rev. R.A.P. 1 and 5.

2. "Consistent with this Court's practice in cases involving sensitive matters, only the initials of the victim will be used." *State v. Wears*, 222 W.Va. 439, 441 n. 1, 665 S.E.2d 273, 275 n. 1 (2008).

3. Ms. Brennan testified that she had given up parental rights to her child and had been ordered to undergo treatment for drugs as a result of her drug addiction.

ty initially denied that anything bad had occurred, he then told the police about the rape and the murder. The information given to the police by Mr. Douty was consistent with the information provided to them by Ms. Brennan. Mr. Douty also took the police to the victim's body, which was located at Dam 4. By this time, approximately three weeks had passed since the murder had occurred and the body was badly decomposed and unidentifiable. The body ultimately was identified forensically as being the victim, T. S.

Mr. Douty entered into a plea agreement[4] with the Appellee in exchange for his testimony at trial. At trial, Mr. Douty testified regarding his plea agreement. He also testified that he had a criminal history and that during Memorial Day weekend he was smoking crack with the Appellant and two other people. Mr. Douty testified that he and the Appellant picked up a girl that neither of them knew by inviting her to go get high with them. The three of them drove to the Appellant's house, which Mr. Douty described. He said that the Appellant punched the girl in the face and told her to remove her pants. The Appellant had intercourse with the victim and then Mr. Douty had intercourse with her. Mr. Douty stated that when the victim refused to engage in oral sex with the Appellant, the Appellant beat her until her head started to bleed and she went limp. According to Mr. Douty, the Appellant proceeded to carry the victim upstairs to a bathtub and Mr. Douty tried to clean her. Mr. Douty stated the Appellant left the room and when he returned, the Appellant had slit the victim's throat with a large knife. The Appellant then instructed Mr. Douty to get a plastic tote. The Appellant put some cleaner in the victim's mouth and vaginal area. According to Mr. Douty's testimony, the two men then put the victim into the tote and took it to the Appellant's gold car and placed the tote in the trunk. Mr. Douty suggested that they dump the victim's body at Dam 4. The two then returned the tote to the Appel-

lant's house. Surveillance video from a gas station and a convenience store showed Mr. Douty and the Appellant together on the night that the alleged murder occurred.

Trooper Lonnie Faircloth of the West Virginia State Police also testified. His only involvement in the case was that he was sent to the Potomac Highlands Regional Jail to collect a DNA sample from the Appellant pursuant to a court order. The Appellant was not *Mirandized*[5] by Trooper Faircloth at the time he collected the DNA sample. The Appellant asked the trooper why he was taking samples. Trooper Faircloth told him that he did not know. The Appellant then responded that he did not "know what was taking so long, they had a pretty solid case, that if he was in Virginia he would already have been to trial and sentenced by now." Trooper Faircloth stated that he did not respond to the Appellant's unsolicited statement.

Dr. Kaplan, the State's Medical Examiner, testified that the victim's cause of death was determined to be a fatal physical assault with strong evidence of a sexual assault preceding. The death was ruled a homicide. Additionally, according to the testimony of Melissa Runyan, an employee of the West Virginia State Police Crime Lab in the biochemistry section, DNA from semen found on a couch in the Appellant's home was consistent with Mr. Douty's DNA. Ms. Runyan further testified that the sample from the couch was a mixture of DNA from three people from which the Appellant's DNA could not be excluded. Regarding three other samples taken from the couch, Ms. Runyan testified that while Mr. Douty was excluded, the Appellant and the victim could not be excluded.

At the end of the State's case-in-chief, the Appellant moved for acquittal, which was denied by the circuit court. The Appellant recalled one of the Appellee's witnesses, Trooper Bowman, and questioned him about two portions of Mr. Douty's statement, which contradicted Mr. Douty's trial testimony.

---

4. Mr. Douty pleaded to felony murder, with the underlying felony being sexual assault. Under the terms of the agreement, Mr. Douty received a recommendation of mercy in exchange for his testimony against the Appellant.

5. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

First, in the statement, Mr. Douty said that he helped carry the victim upstairs. At trial, however, Mr. Douty testified that the Appellant carried the victim upstairs. Next, in his statement, Mr. Douty described both he and the Appellant making the victim have oral sex with each of them. At trial, Mr. Douty testified that he only had vaginal sex with the victim.

After the defense rested, the Appellant renewed his motion for acquittal, which again was denied by the circuit court. Thereafter, during the discussion of the instructions to be given to the jury, the Appellant did not object regarding the circuit court's failure to instruct the jury on guidelines for their mercy determination. The jury returned a guilty verdict on all three charges and there was no mercy recommendation.

## II. Discussion of Law

### A. Motions for Acquittal

█ The Appellant first complains that the circuit court erred in failing to grant his motions for acquittal. The Appellant argues that the Appellee failed to present credible evidence sufficient to carry its burden of proof on the charges against the Appellant. The Appellee maintains that the trial court properly exercised its discretion in denying the Appellant's motions for acquittal.

█ The Court applies a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence. *State v. LaRock*, 196 W.Va. 294, 304, 470 S.E.2d 613, 623 (1996). As this Court has further explained:

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. Pt. 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

█ Moreover,

[a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169, Syl. Pt 3, in part.

Utilizing the foregoing standards, the Court examines whether there was sufficient evidence to support the Appellant's conviction. The Appellee introduced evidence including the testimony of another participant, Mr. Douty, in these crimes. There was testimony from Mr. Douty regarding how he and the Appellant sexually assaulted the victim, and how the Appellant beat the victim, then slit the victim's throat. Mr. Douty also took police to where he and the Appellant dumped the victim's body.

The Appellant's girlfriend, who did not know Mr. Douty, testified to a nearly identical story regarding the murder and sexual assault of the victim by Mr. Douty and the Appellant. The Appellant's girlfriend testified that the story had been conveyed to her by the Appellant. Further, the jury heard forensic evidence regarding the victim's identification, as well as DNA linking Mr. Douty, the Appellant, and the victim to the Appellant's home. There was also video surveillance showing that the Appellant and Mr. Douty were together on the day of the murder. Finally, a state trooper testified regarding the Appellant's statement that the Appellant did not "know what was taking so

long, they had a pretty solid case, that if he was in Virginia he would have already been to trial and sentenced by now."

■ All of the credibility problems with Mr. Douty, including the inconsistences between his statement to police and his trial testimony, were heard by the jury. *See* Syl. Pt. 2, *State v. Smith*, 225 W.Va. 706, 696 S.E.2d 8, *cert. denied*, — U.S. —, 131 S.Ct. 579, 178 L.Ed.2d 422 (2010) (" 'In the trial of a criminal prosecution, where guilt or innocence depends on conflicting evidence, the weight and credibility of the testimony of any witness is for jury determination.' Syllabus Point 1, *State v. Harlow*, 137 W.Va. 251, 71 S.E.2d 330 (1952)."). Additionally, the Appellant claimed at trial that his girlfriend lied in order to seek revenge on him. The Appellant questioned Ms. Brennan during trial about an abuse and neglect proceeding that was initiated against them. Both the Appellant and Ms. Brennan ultimately had their parental rights terminated. The Appellant questioned Ms. Brennan about her blaming the Appellant for this in an attempt to impeach her credibility. Again, the jury heard this evidence during the trial. On appeal, the Court "must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution." *Guthrie*, 194 W.Va. at 663, 461 S.E.2d at 169, Syl. Pt 1, in part. Consequently, after viewing the evidence in the light most favorable to the Appellee, the Court concludes that the jury was presented with sufficient evidence to find the Appellant guilty of the crimes charged beyond a reasonable doubt. *Id.*, Syl. Pt 3, in part.

### B. Appellant's Statement

■ The Appellant also maintains that the circuit court erred in allowing his statement given to the state trooper who took his DNA sample to be admitted into evidence. The statement at issue was the Appellant telling the state police officer that he did not "know what was taking so long, they had a pretty solid case, that if he was in Virginia he would have already been to trial and sentenced by now." The Appellant argues that

he was not given *Miranda* warnings prior to making this statement. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[6] The Appellee argues that the circuit court properly admitted the Appellant's statement at trial.

■ In resolving the issue of the admissibility of the Appellant's statement, the following standard of review governs:

On appeal, legal conclusions made with regard to suppression determinations are reviewed *de novo*. Factual determinations upon which these legal conclusions are based are reviewed under the clearly erroneous standard. In addition, factual findings based, at least in part, on determinations of witness credibility are accorded great deference.

Syl. Pt. 3, *State v. Stuart*, 192 W.Va. 428, 452 S.E.2d 886 (1994); Syl. Pt. 2, *State v. Farley*, 192 W.Va. 247, 452 S.E.2d 50 (1994)("This Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession is voluntary and whether the lower court applied the correct legal standard in making its determination. The holdings of prior West Virginia cases suggest deference in this area continue, but that deference is limited to factual findings as opposed to legal conclusions.").

■ In *State v. Newcomb*, 223 W.Va. 843, 679 S.E.2d 675 (2009), the Court examined whether a statement was subject to *Miranda* as follows:

In *Rhode Island v. Innis*, 446 U.S. 291, 300–302, 100 S.Ct. 1682, 1689–1690, 64 L.Ed.2d 297 (1980), the United States Supreme Court held:

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally

---

**6.** The Appellant's sole basis for challenging the admission of the statement was that the state

trooper obtained the statement in violation of *Miranda*. *See* 384 U.S. 436, 86 S.Ct. 1602.

attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

Thereafter, in Syllabus Point 8 of *Guthrie, supra,* this Court explained that:

> The special safeguards outlined in *Miranda* are not required where a suspect is simply taken into custody, but rather only where a suspect in custody is subjected to interrogation. To the extent that language in *State v. Preece,* 181 W.Va. 633, 383 S.E.2d 815 (1989), and its progeny, may be read to hold differently, such language is expressly overruled.

*Newcomb,* 223 W.Va. at 862, 679 S.E.2d at 694 and Syl. Pt. 10.

In the instant case, the circuit court did not err in determining that the Appellant's statement was not the result of any interrogation or conduct by the police that was reasonably likely to illicit from the Appellant an incriminating response. The officer, who took the DNA sample from the Appellant pursuant to a court order, testified that he asked no questions of the Appellant and offered no information to the Appellant. Consequently, because there was no interrogation of the Appellant by the officer in taking the DNA sample, there is no violation of *Miranda.*

## C. Motion to Strike Prospective Juror

The Appellant alleges that the circuit court erred in denying his motion to strike a potential juror, David Smallwood, for cause. Specifically, the Appellant argues in his brief that the potential juror was "predisposed to make a recommendation of no mercy verdict." The Appellant contends that the juror stated that it would be "unlikely that I would feel any mercy but I would have to, you know, I would have to hear the case through." The juror also said that he is a strong proponent of the death penalty and believes that West Virginia should adopt it as a sentence. Because the circuit court refused to grant the Appellant's motion, he was forced to use a peremptory strike to eliminate the juror. In contrast, the Appellee maintains that Juror Smallwood indicated that he favored a state law permitting the death penalty, but he acknowledged that West Virginia does not have the death penalty, that he could grant mercy and that he would have to listen to the facts of the case before making a decision.

The abuse of discretion standard of review is used in deciding juror disqualification issues based on bias and prejudice. *O'Dell v. Miller,* 211 W.Va. 285, 288, 565 S.E.2d 407, 410 (2002). As the Court held:

> When considering whether to excuse a prospective juror for cause, a trial court is required to consider the totality of the circumstances and grounds relating to a potential request to excuse a prospective juror, to make a full inquiry to examine those circumstances and to resolve any doubts in favor of excusing the juror.

*Id.* at 287, 565 S.E.2d at 409, Syl. Pt. 3; *see State v. Gilman,* 226 W.Va. 453, 462, 702 S.E.2d 276, 285 (2010).

A review of the record reveals that Juror Smallwood told the circuit court that it was his belief that West Virginia should have a death penalty. When questioned further about West Virginia not having the death penalty and whether, in light of that, Juror Smallwood could recommend mercy, the juror responded:

> I have to, you know, hear the case. I don't know if I could stand here and give

that decision at this very time but it would probably be unlikely that I would feel any mercy but I would have to, you know, I would have to hear the case through.

Based upon an examination of the entire voir dire of Juror Smallwood, the Court finds that the circuit court did not err in denying the Appellant's motion to strike the juror for cause.

### D. Guidelines for Mercy in First Degree Murder Cases

▮ The Appellant asks the Court to invoke the plain error doctrine and find that the circuit court engaged in plain error by failing to give an instruction to the jury setting forth guidelines that the jury should consider in determining whether to give the Appellant mercy in a unitary trial. The Appellant offered no such instruction nor did he object to the instructions given by the circuit court at the time of trial. The Appellee asserts that the law in this State is clear that an instruction to the jury outlining factors to be considered in determining mercy in murder cases should not be given.

▮ Because the Appellant concedes that he offered no objection to the jury instructions proposed or submitting, the only means by which this Court can find error would be to invoke the plain error doctrine. *See State v. Lively*, 226 W.Va. 81, 92, 697 S.E.2d 117, 128 (2010) ("The Court consistently has held that 'silence may operate as a waiver of objections to error and irregularities at the trial which, if seasonably made and presented, might have been regarded as prejudicial.' *State v. Grimmer*, 162 W.Va. 588, 595, 251 S.E.2d 780, 785 (1979), *overruled on other grounds, State v. Petry*, 166 W.Va. 153, 273 S.E.2d 346 (1980). The raise or waive rule is designed 'to prevent a party from obtaining an unfair advantage by failing to give the trial court an opportunity to rule on the objection and thereby correct potential error.' *Wimer v. Hinkle*, 180 W.Va. 660, 663, 379 S.E.2d 383, 386 (1989).").

▮ In order for the Court to find plain error occurred in this case, "there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public repu-

tation of the judicial proceedings." Syl. Pt. 7, in part, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). In this case, however, the Court finds that the Appellant cannot establish the first element needed to show plain error, which is that any error occurred. To the contrary, the Court has previously resolved this issue in syllabus point one of *State v. Miller*, 178 W.Va. 618, 363 S.E.2d 504 (1987), wherein the Court held that "[a]n instruction outlining factors which a jury should consider in determining whether to grant mercy in a first degree murder case should not be given." *Id.* at 619, 363 S.E.2d at 505; *see also State v. McLaughlin*, 226 W.Va. 229, 234 n. 12, 700 S.E.2d 289, 293 n. 12 (2010), *cert. denied,* — U.S. —, 131 S.Ct. 1056, 178 L.Ed.2d 873 (2011)(finding that "the Court has already resolved the issue regarding the imposition of standards to guide the jury's exercise of discretion in the mercy or penalty phase in *State v. Miller*, 178 W.Va. 618, 622 & n. 8, 363 S.E.2d 504, 508 & n. 8 (1987)."). In so holding, the Court, in *Miller*, noted that "[i]n jurisdictions where the decision to recommend mercy is left entirely within the discretion of the jury and is made binding on the trial court, it is uniformly held that an instruction which enumerates instances or suggests when a mercy recommendation might be appropriate is reversible error." *Id.* at 622, 363 S.E.2d at 508. Accordingly, the Court determines that the circuit court committed no error regarding this issue.

### III. Conclusion

For the reasons stated above, the decision of the Circuit Court of Berkeley County entered on December 1, 2009, is affirmed.

Affirmed.