# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs) No. 17-0754** (Mercer County 16-F-20)

**Sonja Bone,**
**Defendant Below, Petitioner**

and

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs) No. 17-0801** (Mercer County 16-F-21)

**Monty Bone,**
**Defendant Below, Petitioner**

**FILED**

**November 16, 2018**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Sonja Bone, by counsel John G. Byrd, and Petitioner Monty Bone, by counsel David B. Kelley, appeal orders entered in the Circuit Court of Mercer County on July 24, 2017, that denied their respective motions for a new trial following their convictions by a jury of abuse of an incapacitated adult causing bodily injury, neglect of an incapacitated adult causing bodily injury, and conspiracy.[1] The State of West Virginia, by counsel Robert L. Hogan, filed a response in support of the circuit court's orders, a supplemental appendix, and a cross-assignment of error on the issue of sentencing. Petitioners each filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order and remanding this matter for modification of petitioners' sentences is appropriate under Rule 21 of the Rules of Appellate Procedure.

On July 11, 2015, eighty-seven-year-old Nancy Bone ("the victim"), Petitioner Monty Bone's mother and Petitioner Sonja Bone's mother-in-law, was taken by ambulance to Bluefield Regional Medical Center. According to the notes of EMT William K. Croye, Jr., the victim was

---

[1]Petitioners' appeals were consolidated by order entered on November 14, 2017.

1

found in her bed; was very dirty; had multiple bruises in various stages of healing; and had many skin tears, some with pus coming out of them, and bandages on her arms. Some of the bandages were old and needed to be changed. Mr. Croye's notes also indicated that the victim's bedroom was dirty and very cluttered and that the entire house was also very cluttered, hot, and smelled of animal urine. The victim was suffering from an altered level of consciousness and was unable to answer questions or communicate. At trial, Mr. Croye testified that, "in 16 years, it was one of those situations that I'll never forget, just the condition that she was in."

The victim was admitted to the hospital with acute renal failure, hypernatremia, dehydration, failure to thrive, and shingles. One of the victim's nurses, Sarah Maynard, suspected that the victim had been abused and took photographs of her. The photographs depicted multiple bruises, skin tears, scabs, and pressure wounds on numerous parts of her body. Nurse Maynard testified that she had never before seen a patient in such poor condition. In a nursing note, Nurse Maynard wrote that, when asked, the victim knew her name, birth date, and address, "but was not oriented to day/year or surroundings, location." When asked if she had been abused at home, she said "yes" and identified her abusers as "[V]ernon and [M]onty." (According to the State, petitioners' son, Brendan, stayed with Monty in the victim's home; Nurse Maynard agreed that because the victim had difficulty speaking, she could have been trying to say "Brendan" rather than "Vernon."). The victim told Nurse Maynard that "'they kick me, punch me, stomp on my feet[,]'" and that "'[M]onty throws me down on the bed really hard.'" According to Nurse Maynard's notes, the victim also stated that "her family 'hid her heater in the closet because they didn't want to pay the bill,'" that they did not turn or bathe her, and that she only "sometimes" had hot meals. The victim thanked Nurse Maynard for finding her and stated that she did not want go back to her house.

Similarly, Diane McQuillen, D.O., a physician who took part in the victim's treatment and care at the hospital, testified that she would never forget the victim's condition when she was brought in and that she believed the victim had suffered "serious bodily injury." Dr. McQuillen testified that the victim had stage three and four pressure ulcers, including infection with full thickness loss of skin and subcutaneous tissue (i.e., down to the bone) and that these injuries could not have developed in just forty-eight hours as petitioners claimed. The evidence revealed that the victim had been seen by a physician only one time in the preceding eighteen months and, in Dr. McQuillen's opinion, this was inadequate. She further opined that the bruises on the victim's breasts were consistent with being tweaked, twisted, or pinched, and inconsistent with attempts by caregivers to lift her from behind. Bruises to the victim's face were, in Dr. McQuillen's view, inconsistent with a fall. Dr. McQuillen testified that she believed the victim had been neglected.[2]

Detective Kenneth Adams of the Bluefield Police Department, who investigated this matter, obtained statements from each petitioner. They admitted that they began caring for the the victim after her husband became too ill to care for her[3] in December 2013, and then, after he died in January of 2014, they became her primary caregivers. Petitioners stated that the victim

---

[2] The victim died on August 28, 2015.

[3] The victim had a stroke in the late 1990s.

2

often fell but implied that her condition deteriorated shortly after she was hospitalized. Petitioner Sonja Bone gave three photographs of the victim to Detective Adams. Two photographs showed the victim lying on the floor near her bed, under her potty chair. The other photograph showed her sitting in a chair slumped over a small food tray or table.

Adult Protective Services worker Rebecca Jennings prepared a contact summary following a conversation with Petitioner Monty Bone on July 22, 2015. According to the summary, Monty called for an ambulance on July 14, because the victim had developed a rash on her chest and had not been eating regularly. He advised Ms. Jennings that he was unaware that the victim had shingles. He further advised that he cared for the victim at her home because neither he nor the victim wanted her to be placed in a nursing home; that his children assisted him with caring for the victim; that he helped her with toileting, wheel chair transfer, and meals; that she stayed in the wheel chair while he is away at work and then he helped to transfer her to her bed when he goes home; and that Petitioner Sonja Bone and petitioners' daughter helped with the victim's hygiene.

Petitioners were jointly indicted in the Circuit Court of Mercer County in February of 2016 on one count of abuse of an incapacitated adult causing serious bodily injury; four counts of neglect of an incapacitated adult causing serious bodily injury; one count of malicious assault; and one count of conspiracy to abuse and/or neglect an incapacitated adult. Petitioners were jointly tried.

Petitioner Monty Bone was convicted of one count of the lesser included offense of abuse of an incapacitated adult causing bodily injury; three counts of the lesser included offense of neglect of an incapacitated adult causing bodily injury; and one count of conspiracy. Petitioner Sonja Bone was convicted of one count of the lesser included offense of abuse of an incapacitated adult causing bodily injury; two counts of the lesser included offense of neglect of an incapacitated adult causing bodily injury; and one count of conspiracy. Petitioners were acquitted of the remaining charges.

Petitioners filed motions for a new trial, which were denied in orders entered on July 24, 2017. Also in the July 24, 2017, orders, the circuit court sentenced Petitioner Monty Bone to one to five years of incarceration for abuse of an incapacitated adult causing bodily injury (Count 1); one to five years for neglect of an incapacitated adult causing bodily injury (Counts 2, 3, and 5); and one year for conspiracy (Count 7). The sentences for Counts 1 and 2 were ordered to run concurrently with one another; the sentences for Counts 3 and 5 were ordered to run concurrently with one another and consecutively with Counts 1 and 2; and the sentence for Count 7 was ordered to run concurrently with Count 5. The circuit court sentenced Petitioner Sonja Bone to one to five years of incarceration for abuse of an incapacitated adult causing bodily injury (Count 1); one to five years for neglect of an incapacitated adult causing bodily injury (Counts 3 and 5); and one year for conspiracy (Count 7). The sentences for Counts 1 and 3 were ordered to run concurrently with one another while Counts 5 and 7 were ordered to run concurrently with one another and consecutively with Counts 1 and 3. Petitioner Sonja Bone's sentences were suspended and she was placed on probation for a period of three years. This appeal followed.

This Court reviews an order denying a motion for a new trial under the following standard:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, *State v. Vance,* 207 W. Va. 640, 535 S.E.2d 484 (2000).

We first address petitioners' argument that the circuit court erred in allowing the State to introduce evidence that, after the victim added Petitioner Monty Bone to her bank account as a joint account holder, he made numerous personal expenditures that did not benefit the victim. The State introduced evidence that Monty purchased a travel trailer for $5,600, two tractors totaling $15,200, and spent various amounts at retail and eating establishments. The evidence further revealed that the amount of money expended from the bank account totaled in the tens of thousands of dollars. At a pre-trial hearing, the State argued that it intended to offer this evidence to show "motive and that [petitioners] had control and care and custody of [the victim]. They controlled all her finances." The State further argued that this evidence was intended to show that petitioners had the financial means to pay for items and services that the victim needed but was not provided, including items that could have reduced or prevented her injuries and caregivers who could have provided home health services or taken her to the doctor. In ruling that the bank records would be admissible at trial, the circuit court determined that the evidence

> goes to the element of incapacitation, the fact that this person did not have control of her finances, goes in part to the element of the State [sic] has to prove that she was incapacitated at the time these injuries were allegedly inflicted by the Defendants. And, I think it could also go to motive.

On appeal, petitioners contend that Petitioner Monty Bone did not owe a fiduciary duty to the victim; that he was a joint holder of the bank account and, as such, was lawfully entitled to spend the money as he saw fit, *see* W.Va. Code § 31A-4-33; and that evidence of the bank records and Monty's personal expenditures was not relevant to prove any of the elements of the crimes for which petitioners were being tried. *See* W.Va. R. Evid. 401.[4] Furthermore, petitioners argue, even if this evidence were relevant, it should have nonetheless been excluded because its probative value was substantially outweighed by the danger of unfair prejudice. *See* W.Va. R. Evid. 403. We find no error.

This Court has made clear that

---

[4] Under West Virginia Rule of Evidence 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

"[t]he West Virginia Rules of Evidence . . . allocate significant discretion to the trial court in making evidentiary . . . rulings. Thus, rulings on the admissibility of evidence . . . are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary . . . rulings of the circuit court under an abuse of discretion standard."

Syl. Pt. 1, in part, *McDougal v. McCammon,* 193 W. Va. 229, 455 S.E.2d 788 (1995). *See also State v. LaRock,* 196 W. Va. 294, 306, 470 S.E.2d 613, 625 (1996) ("The decision to admit or reject evidence is committed to the sound discretion of a trial court, and the court's determinations are reviewable only for an abuse of discretion."). We have explained that "[o]nly rarely and in extraordinary circumstances will we, from the vista of a cold appellate record, reverse a circuit court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect[,]" and that, "[i]n general, an abuse of discretion occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed but the circuit court makes a serious mistake in weighing them." *Gentry v. Mangum,* 195 W. Va. 512, 520 n.6, 466 S.E.2d 171, 179 n.6 (1995).

Petitioners were charged with abusing and neglecting an incapacitated adult causing serious bodily injury and conspiracy. The victim had not seen a doctor during the eighteen months preceding her hospital admission. She was found dirty in a hot, cluttered house, with numerous pressure ulcers, skin tears and bandages that were old and needed changing. Petitioners did not engage a caregiver or home health services to assist in caring for the victim or to otherwise ensure her safety in the home. Evidence of the bank records was intended to show that there were sufficient funds available but not spent for such purposes. According to the bank records, petitioners instead expended tens of thousands of dollars of the money for their own personal use and benefit while the victim's needs were neglected. Given all of this evidence, we find that the circuit court did not abuse its discretion in admitting evidence of the victim's bank records at trial.

Next, petitioners argue that the circuit court erred in allowing gruesome photographs depicting multiple bruises, skin tears, scabs, and pressure wounds on the victim's body to be admitted into evidence at trial. Petitioner Sonja Bone concedes that some of the photographs were admissible "because they go directly to the elements of the indicted offenses." However, she argues that some are duplicative and, thus, cumulative. As a result, she argues, the admission of the photographs was unfairly prejudicial to the defense. Petitioner Monty Bone argues that the photographs were "revolting," "like a horror picture," and "prejudicial" because, in some instances, they were discolored and "made the wounds look more gruesome" than they actually were.

"The admissibility of photographs over a gruesome objection must be determined on a case-by-case basis pursuant to Rules 401 through 403 of the West Virginia Rules of Evidence." Syl. Pt. 8, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994). As we further explained in *Derr*,

[a]lthough Rules 401 and 402 of the West Virginia Rules of Evidence strongly encourage the admission of as much evidence as possible, Rule 403 of

the West Virginia Rules of Evidence restricts this liberal policy by requiring a balancing of interests to determine whether logically relevant is legally relevant evidence. Specifically, Rule 403 provides that although relevant, evidence may nevertheless be excluded when the danger of unfair prejudice, confusion, or undue delay is disproportionate to the value of the evidence.

Rule 401 of the West Virginia Rules of Evidence requires the trial court to determine the relevancy of the exhibit on the basis of whether the photograph is probative as to a fact of consequence in the case. The trial court then must consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule 403 of the West Virginia Rules of Evidence. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse.

192 W. Va. at 168, 451 S.E.2d at 734, syl. pts. 9 and 10.[5]

We find no error. We first note that petitioners do not challenge the admissibility of all twenty-two of the photographs offered by the State. Nonetheless, they fail to specifically identify which photographs they believe to be cumulative and, thus, unfairly prejudicial, or so discolored as to be misrepresentative of the victim's injuries. The photographs of the victim's injuries were taken at the hospital by the nursing staff shortly after the victim was admitted. At a pre-trial hearing, the circuit court determined that the State was required to prove "serious bodily injury" and concluded that the photographs were probative on that issue and that they "document[ed] the injuries that [the victim] had. . . . it's a material issue for the State." We agree that, given the gravity of the crimes charged, the circuit court did not abuse its discretion by allowing the jury to view the photographs depicting the severity of the victim's injuries.

Petitioners next argue that the circuit court erred in admitting statements the victim made to hospital staff because they were hearsay that did not satisfy any of the basic exceptions to the hearsay rule. Nurse Maynard and Dr. McQuillen testified that the victim stated that petitioners kicked and punched her, stomped on her feet, and threw her down on the bed. The victim also told them that petitioners hid her heater, failed to turn or bathe her, and only sometimes provided her with a hot meal. Petitioners argue that the victim's statements were offered to prove the truth

---

[5] Petitioner Monty Bone's argument that the State was required to show that the gruesome photographs were "of essential evidentiary value to its case[,]" as required by *State v. Rowe*, 163 W. Va. 593, 596, 259 S.E.2d 26, 28 (1979), is incorrect because *Rowe* is no longer good law. *Rowe* was decided six years before the adoption of the West Virginia Rules of Evidence and was overruled in syllabus point six of *Derr*, which held that "[w]hatever the wisdom and utility of *State v. Rowe*, 163 W.Va. 593, 259 S.E.2d 26 (1979), and its progeny, it is clear that the *Rowe* balancing test did not survive the adoption of the West Virginia Rules of Evidence. Therefore, *State v. Rowe, supra,* is expressly overruled because it is manifestly incompatible with Rule 403 of the West Virginia Rules of Evidence." 192 W.Va. at 168, 451 S.E.2d at 734.

of the matters asserted, *see* W.Va.R.Evid. 801,[6] and were not admissible as statements made for medical diagnosis or treatment, as set forth in Rule 803(4).

Rule 803(4) excludes from the hearsay rule a statement that "(A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." *See also* Syl. Pt. 4, *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). As we held in *Edward Charles L.*,

> [t]he two-part test set for admitting hearsay statements pursuant to W.Va.R.Evid. 803(4) is (1) the declarant's motive in making the statements must be consistent with the purposes of promoting treatment, and (2) the content of the statement must be such as is reasonably relied upon by a physician in treatment or diagnosis.

183 W. Va. at 644, 398 S.E.2d at 126, at syl. pt. 5. Petitioners contend that the Rule 803(4) exception is not satisfied because the evidence showed that the victim was delirious at the time she spoke with medical personnel and, as a result, she was unable to formulate a motive that was consistent with the purposes of promoting treatment. Similarly, petitioners argue, the content of the victim's statement was not of the type reasonably relied upon by a physician in treatment or diagnosis because the identity of the perpetrators was not relevant to the type of medical treatment the victim would receive.

We find no error. The victim was found by medical personnel in her bed and in deplorable living conditions. She presented to the hospital with injuries and an overall condition that medical providers testified were among the worst they had ever seen. She recounted to Nurse Maynard and Dr. McQuillen how poorly she had been treated by the people entrusted with her care and thanked medical personnel for finding her and asked that she not be returned to her home. Because the victim was physically incapacitated while living in her own home, it was important that the cause of her injuries be ascertained so that decisions could be made as to whether she be returned there and to the care of petitioners, referred to a social worker, or become a ward of the State.[7] Thus, the victim's testimony did not violate Rule 803(4) and was properly admitted at trial.

Petitioners' next assignment of error concerns whether the State properly cross-examined them as to whether they could prove, through documentation such as credit card or pharmacy records, that they filled the victim's prescription medications. (Petitioners could provide no such records below.) Petitioners contend that, through this line of questioning, the State improperly

---

[6] West Virginia Rule of Evidence 801(c) defines "hearsay" as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."

[7] According to the State's brief, the victim became a ward of the State. After she was discharged from the hospital on July 22, 2015, she was placed in a nursing home where she died approximately one month later.

shifted the burden of proof to petitioners, effectively requiring then to prove their innocence. Similarly, they argue that, during closing arguments, the State improperly remarked that Petitioner Monty Bone "started explaining about chronic and acute illnesses and stated that [the victim's] chronic illnesses were maintained while the [petitioners] assumed care. What evidence is there? There's no pharmacy records." On appeal, petitioners argue that the State's burden-shifting and closing remarks are reversible error that warrant a new trial.

Upon our review of the record, it is clear that petitioners failed to object to either the line of questioning or the State's closing remarks about which they now complain. This Court has cautioned that "'[w]here objections were not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal.'" (citation omitted)). Syl. Pt. 3, *O'Neal v. Peake Operating Co.,* 185 W. Va. 28, 404 S.E.2d 420 (1991). *See also* Syl. Pt. 11, *State v. Davis*, 205 W. Va. 569, 519 S.E.2d 852 (1999) ("'Failure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court.' Syllabus Point 6, *Yuncke v. Welker,* 128 W.Va. 299, 36 S.E.2d 410 (1945)."). Petitioners have, thus, waived this assignment of error.

Next, we address Petitioner Monty Bone's argument that the circuit court erred in allowing the State to ask leading questions of its witness, Adult Protective Services worker Rebecca Jennings. He specifically points to the following exchange:

Q: Did [Petitioner Monty Bone] provide you with the statements that he said he was going to?

A: No.

Q: Are you aware that his son was school age?

A: Yes.

Q: So, he wasn't in school? Or, was it during the summer?

[Defense counsel]: Objection, Your Honor. She's leading the witness.

The Court: Overruled.

Aside from referencing West Virginia Rule of Evidence 611(c), which generally prohibits leading questions on direct examination "except as may be necessary to develop a witness's testimony[,]" Petitioner Monty Bone fails to even suggest that this obviously benign line of questioning prejudiced his defense. Because we find this assignment of error to be frivolous and, therefore, without merit, we decline to address it.

Petitioner Monty Bone next argues that the State failed to produce sufficient evidence that he either conspired to neglect the victim or intended to cause her bodily injury. He contends that, to the contrary, the evidence showed that he and Petitioner Sonja Bone helped and attended to the victim to the best of their abilities. For example, Sonja testified that her daily routine

included toileting the victim and changing her clothes; bathing her; helping her into her wheelchair and putting her into her recliner to watch television; and fixing her a hot and healthy breakfast. Both petitioners testified that Sonja sewed a cushion out of sheepskin for the victim's wheelchair to keep the worn chair from scraping her. Similarly, Petitioner Monty Bone testified that he attempted to prevent her from falling out of bed by purchasing and attempting to install a bedrail. He contends that this evidence demonstrated that both petitioners tried to make the victim feel safe, loved, and cared for at all times and that they had no intent to cause her bodily injury. Regarding the conspiracy conviction, Petitioner Monty Bone argues that there was no reason to conspire to neglect the victim because he "owned the bank account and could use it in any manner he saw fit."

It is well settled that this Court's standard of reviewing claims of insufficiency of the evidence places a heavy burden on a criminal defendant:

> "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syl. Pt. 1, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995).

Syl. Pt. 1, *State v. Juntilla,* 227 W. Va. 492, 711 S.E.2d 562 (2011). Moreover,

> "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." Syl. Pt. 3, in part, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995).

*Juntilla,* 227 W. Va. at 494, 711 S.E.2d at 564, at syl. pt. 2.

Viewing the evidence in the light most favorable to the State, and crediting all inferences and credibility assessments that the jury might have drawn in favor of the prosecution, we conclude that Petitioner Monty Bone has failed to satisfy his burden. As previously recounted, there was more than sufficient evidence that petitioners conspired to abuse and neglect the victim. The victim was in dire physical condition when she was found in her home by medical personnel. While under the care of petitioners, she presented with numerous pressure ulcers, multiple bruises, skin tears, and scabs, as well as old bandages that needed changing. According

9

to Dr. McQuillen, the victim had bruises on her breasts that were consistent with being tweaked, twisted, or pinched. The victim told medical personnel that petitioners kicked, stomped, and punched her, threw her onto the bed, and failed to turn, bathe, or feed her hot meals. The victim's living conditions were so deplorable, and her physical condition so poor, that she asked never to be returned to her home. Medical personnel described her condition as being among the worst they had ever seen. Given these facts, it is clear that the evidence was more than sufficient to convict petitioners of the crimes for which they were tried.

Finally, in a cross-assignment of error, the State argues that the circuit court erred in sentencing petitioners to one to five year terms of incarceration for their convictions of abuse or neglect of an incapacitated person resulting in bodily injury, and in imposing no monetary fine. The State argues that the applicable statute, West Virginia Code § 61-2-29(d), prescribes a fine of "not less than $100 nor more than $1,000" and imprisonment for "not less than two years nor more than ten years."[8] The State contends that petitioners' sentences should be vacated and the cases remanded for proper sentencing, in conformity with this statute. Petitioner Monty Bone counters that, at the sentencing hearing, the State failed to object to the sentences imposed and that the circuit court, in its discretion, determined that lesser sentences were appropriate.[9]

This Court has held that it "'reviews sentencing orders . . . under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands.' Syl. Pt. 1, in part, *State v. Lucas*, 201 W.Va. 271, 496 S.E.2d 221 (1997)." Syl. Pt. 1, in relevant part, *State v. James*, 227 W. Va. 407, 710 S.E.2d 98 (2011). Under West Virginia Rule of Criminal Procedure 35(a), "[t]he court may correct an illegal sentence at any time . . . ." We have recognized that "while most illegal sentences are struck down for excess, so too can a sentence be illegal for failing to meet the statutory minimum punishment." *State v. Hubbard*, No. 11-0690, 2012 WL 2892350, at *3 (W.Va. Feb. 13, 2012) (memorandum decision). Clearly, the sentences imposed are illegal ones because they do not fall within the parameters of the applicable statute. Accordingly, we vacate petitioners' sentences and remand this case to the circuit court for re-sentencing in conformity with the applicable statute.

For the foregoing reasons, we affirm the circuit court's July 24, 2017, orders that denied petitioners' motions for a new trial; we further vacate the sentencing orders, and remand this case to the circuit court for re-sentencing in conformity with the applicable statute.

Affirmed, in part, vacated, in part,
and remanded, with directions.

---

[8] West Virginia Code § 61-2-29(d) states:

> A caregiver of an incapacitated adult who intentionally and maliciously abuses or neglects an incapacitated adult and causes the incapacitated adult bodily injury is guilty of a felony and, upon conviction thereof, shall be fined not less than $100 nor more than $1,000 and imprisoned in a state correctional facility not less than two years nor more than ten years.

[9] Petitioner Sonja Bone, whose sentences were ordered suspended, agrees with the State's cross-assignment of error regarding sentencing.

**ISSUED:** November 16, 2018

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins
Justice Paul T. Farrell, sitting by temporary assignment

11