# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 20-1004** (Jefferson County CC-19-2020-F-5)

**Elliott D. Lansdowne,**
**Defendant Below, Petitioner**

## MEMORANDUM DECISION

Petitioner Elliott D. Lansdowne, by counsel B. Craig Manford, appeals the November 16, 2020, order of the Circuit Court of Jefferson County sentencing petitioner to consecutive sentences of life in the penitentiary without the possibility of parole for first-degree murder and ten years in the penitentiary for use or presentation of a firearm during the commission of a felony. Respondent State of West Virginia, by counsel Patrick Morrisey and Andrea Nease Proper, filed a response in support of the circuit court's order.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

On August 24, 2019, petitioner shot and killed Taylor Ann Pond ("the victim") through her closed exterior apartment door. The victim and petitioner were both twenty-eight years old at the time of the shooting. In January of 2020, petitioner was indicted on one count of first-degree murder and one count of use or presentation of a firearm during the commission of a felony.

In advance of his trial, petitioner filed two motions: a motion to suppress and a motion to continue the trial. In the first motion, petitioner sought to suppress the recorded interview he gave to Officers Alissa Meeks and Jason Newlin of the Charles Town Police Department on August 25, 2019. Petitioner argued that the interview contained inculpatory custodial statements, asserting that

> the interrogation tactics employed by the State fomented both hope and despair in
> the mind of [petitioner]; misrepresentations or mistaken statements of law [were]
> made by law enforcement to [petitioner] [that] affected the voluntariness of his

1

statement; and promises and benefits were held out to [petitioner] to induce his confession, all in violation of law.

Specifically, petitioner took issue with the following portions of the interview:

> MEEKS: What this comes down to is how much time you want to do, okay?
>
> . . . .
>
> PETITIONER: I'm not coming home.
>
> MEEKS: Well, that's up to you.
>
> NEWLIN: It hasn't been decided yet, bud.
>
> . . . .
>
> MEEKS: I can't make you promises, I can't tell you how its going to turn out, but I can tell you now because I've seen it happen, okay, what they do, they take your criminal history, I don't think you're classified as a career criminal. I think you're classified as making some bad mistakes, okay, because I've seen a whole lot of criminal histories[.]
>
> . . . .
>
> MEEKS: It's a first time. Okay. Because I'm going to tell you right now, if I'm sitting there on that bench and I see a young man come to me and I have two people, okay, and I have a young man who comes to me and he says I f**ked up, okay, I didn't mean for it to happen like that but I f**ked up. He owns it. He takes responsibility for it. He has that backbone. It's not what he intended to do but he's owning it like a man. I'm going to respect that guy a whole lot more than another one that comes to me and says I didn't do it, I didn't have any involvement with it, I'm going to wash my hands of it and I'm, going to eat the full time. I don't care what that sentence is. I'm going to respect that. I think you deserve respect and I want you to have that utmost --
>
> . . . .
>
> PETITIONER: I haven't admitted nothing. . . Or denied anything.
>
> NEWLIN: But you kind of haven't helped yourself either, you know what I'm getting at?
>
> . . . .
>
> PETITIONER: For felony crimes do you, like -- good time is, like 50

2

percent of the time or 65 or something.

MEEKS: I can tell you what they do. They can give you credit for responsibility because you know what, a lot of times, like, the one that I was telling you about that just got married in prison, that was the federal, and they give you a reduction of sentence based on acceptance of responsibility because what they will do is -- I don't think that you would be classified as a career criminal. You've got a couple felonies. They're not felonies like I've dealt with in the past so what they do is score those based on -- and I'm just being straight with you, I'm telling you based on your history, okay, because that's how I operate. They score those, you will be given a factor and a level number, and then they reduce it from there. They reduce it from -- what they do is called it basically, like a PSI report, they do background and they determine a factor and then they can lower that number based on acceptance of responsibility. They can lower that number based on how soon you take a plea agreement. They can lower that number based on a lot of factors and that's legit, that's how it works, okay? So you've got stacked up in your head that it's some life sentence, but I'm going to tell you what, that woman in there -- listen.

Respondent filed a response to the motion in which it asserted that, under the totality of the circumstances, petitioner's inculpatory statements were voluntary and not coerced.

In the motion to continue, petitioner asked the trial court to continue his trial for ninety days over concerns that the COVID-19 pandemic might prevent him from receiving a fair trial. More specifically, he stated, "[Petitioner] is fearful that once a jury is empaneled and sits through two to three days['] worth of trial they will undoubtedly rush through their deliberations in an effort to distance themselves from others and possible contact with the virus." The motion also asserted:

[C]ounsel finished a 2 and one-half [day] jury trial on September 4, 2020, in Berkeley County, at which time the jury only deliberated for an hour before reaching a verdict in the case, which was, by the way, guilty on four counts and not guilty on two counts. Of course, counsel cannot cite the [c]ourt to any empirical data or evidence that juries in the Covid-19 climate tend to rush their deliberations but it is obviously a real concern and not just an attempt to stall the proceedings unnecessarily.

Respondent filed a response asking the trial court to deny the motion. In support of its position, respondent stated that Jefferson County was not experiencing a surge in COVID-19 cases and that there was no evidence COVID-19 would influence the jury's deliberations.

The trial court considered both of petitioner's motions during a pretrial hearing. By order entered on September 17, 2020, the trial court denied both of petitioner's motions. Regarding the motion to suppress, the trial court indicated that it reviewed the entirety of petitioner's interview with Officers Meeks and Newlin, finding "by a preponderance of the evidence that the totality of the circumstances show that [petitioner]'s statement was made knowingly and voluntarily, after

3

having been read his <u>Miranda</u> rights." The order went on to state:

> Initially the [c]ourt finds that [petitioner] is clearly intelligent, as he appeared to be engaging in a give-and-take with the officers with his goal being the determination of what evidence they had against him before he eventually showed his cards and gave his side of the shooting. Next, [petitioner]'s criminal history and [petitioner]'s statements make[] clear that he is very familiar with the criminal justice system. Upon review the [c]ourt finds[] no promises were made by the officers to [petitioner] during the interview. Finally, the [c]ourt finds that three (3) to four (4) hours length of the recorded interview is not unduly long. Especially when considering the thirty to forty-five minutes at the beginning of the video and thirty minutes at the end that were dead time.

The trial court further found that "[n]either the discussion about a baby nor Det. Meeks' discussion about federal sentencing procedures produced despair of the kind raised by [petitioner] in the case law cited to the [c]ourt."

Regarding the motion to continue, the trial court concluded that "COVID-19 is not a sufficient ground for a continuance at this time given the current situation and the success of other recent trials in Jefferson and Berkeley counties."

Petitioner's trial began on September 21, 2020, with jury selection. During voir dire, petitioner's counsel asked:

> Is any member of the panel so uncomfortable due to the current COVID-19 pandemic that they would be unable to fulfill [their] duties . . . being in close proximity to other potential jurors despite all the precautions we're taking now and will take during the trial itself? Anybody so uncomfortable with that they couldn't do that? Couldn't actually, you know, you got picked on the jury and you go back and you deliberate, you would be able to express your opinions? You wouldn't rush things, like, let's get out of here, we've been together too long. You would really be able to give everybody a fair shake?

The trial court then explained to the potential jurors that the trial would take place in the "historical courtroom," that the courtroom would become the jury room during breaks, that the jury would be permitted to spread out in the courtroom to conduct deliberations, and that physical distancing would be possible. None of the potential jurors indicated that they would be unwilling or unable to serve on the jury due to the COVID-19 pandemic. After the jury was selected, the trial court advised the jurors:

> So we've taken a courtroom and made adaptations to it to meet the requirements that face us due to COVID and [to] make sure that everybody is safe and if there's anything that happens along the way that is of any concern to you or that you think we can do better, just simply let the bailiff Mr. Pittinger know that and we will accept your recommendation and try to make whatever accommodations we can do and make sure everybody feels safe throughout the process . . . .

4

Opening statements and the presentation of evidence commenced the next day.

The State presented evidence through the testimony of numerous witnesses and exhibits. Petitioner presented no evidence during his case-in-chief. Petitioner's defense, as argued to the jury by his counsel, was that the shooting occurred accidentally when a wreath hanging from the victim's exterior apartment door struck petitioner's hand.

The testimony revealed that the victim shared a second-floor apartment in Charles Town, West Virginia, with Andrea Jodeit. On the evening of the shooting, Ms. Jodeit and her friend, Angel Workman, were in the apartment together with the victim. Just before the shooting, the victim left the apartment and went downstairs to smoke a cigarette. According to Ms. Workman, as the victim returned to the apartment, the victim was talking to someone. Ms. Workman testified:

> [The victim] came through the door. She kept the door cracked but she was talking to somebody. She sounded a little agitated, a little upset, and next thing I know I hear, "Elliott, get that gun out of here," and immediately afterwards she quickly shut the door, threw her weight into it, and maybe, like a second later the shot went off through the door.

Ms. Jodeit gave similar testimony, telling the jury that the victim "came back to the apartment and I just heard her say, 'Elliott, get out of here with that gun,' and then she shut the door and the gun went off." The victim had been shot in the head. Both Ms. Jodeit and Ms. Workman witnessed the shooting. Ms. Jodeit immediately locked the exterior door, and she and Ms. Workman retreated to the bathroom to call 911. At the time of the shooting, a wreath was hanging on the exterior door to the apartment. The wreath was approximately eighteen inches wide and six inches deep. Ms. Jodeit testified that petitioner and the victim had, at one point in the past, been intimate.

Upon arriving at the apartment, officers took statements from individuals at the scene, including Ms. Jodeit, Ms. Workman, and neighbors. The officers determined that petitioner may have been involved in the shooting. Through the early morning hours of August 25, 2019, the officers took numerous photographs of the apartment and collected evidence, which included a shell casing. The officers did not collect the wreath from the door.

On August 25, 2019, petitioner was located by police and placed under arrest. At the time, petitioner was at his parents' home in Frederick County, Maryland. Officers executed a search warrant, recovering a Ruger 9 millimeter P9 semi-automatic pistol and ammunition from petitioner's parents' home.

Following his arrest, petitioner was interviewed by Officers Meeks and Newlin at the Frederick County Sheriff's Office. The interview was recorded, and Officer Meeks questioned

petitioner for approximately two hours and eleven minutes.[1] The officers began the interview by advising petitioner of his *Miranda* rights and went through various legal forms with petitioner. Officer Meeks described petitioner's demeanor during the interview as "calm," "collected," and "not nervous whatsoever." Officer Meeks testified that, during the interview, petitioner admitted to shooting the victim with the Ruger pistol and that at no point did petitioner claim that the shooting was an accident, that the gun accidently fired, or that he did not intend to shoot the victim. Officer Meeks further testified that petitioner made no reference to the wreath on the victim's apartment door. A thirty-five-minute segment of the interview was played for the jury.

During the interview, petitioner told the officers that he was in a relationship with two women at the time of the shooting, one of whom lived in the same apartment building as the victim, and he acknowledged a prior sexual relationship with the victim. According to petitioner, on the day of the shooting, he had visited that girlfriend and was frustrated by the experience. He encountered the victim outside the building where she had been smoking a cigarette. He was cold, and the victim retrieved his hoodie from the building. He told the officers:

> [W]hen she bring me my hoodie out she had it in her hand like this. I looked at it like this. Didn't even look at her. I looked at it and was, like, just pointed to the seat next to me.
>
> . . . .
>
> . . . It was such a dick move. I could have just grabbed the sweater -- if I just grabbed the sweater and said thank you, none of this would have happened. She threw the hoodie at me, like, threw it at me, like, not hard, you know what I'm saying, but just, like, (inaudible), you know.

He then said, "Something triggered me." He followed the victim as she proceeded back to her apartment and told her, "You ever throw something at me again, I'm going to put a bullet in between your eyes." Petitioner stated, "She told me I wasn't going to do shit." He explained to the officers, "That set me off again." He proceeded up the stairs, pulled out his gun, and cocked it. He told the officers that the victim said, "[P]ut that gun away, you ain't going to do shit," prompting him to point the gun at her face. He then said that she shut her apartment door on his face.

When Officer Meeks asked petitioner what he was thinking, he said:

> I wasn't. At that time because the gun was already -- you know, it was already at head range. You know, like, I wasn't thinking. My body just react -- I just reacted. I wasn't thinking at all. I was probably thinking all the way up to the point that until I had my hand like this. Once it was like this, I didn't think.

---

[1] Officer Meeks testified that the total length of the recording of the interview was about three hours and forty-five minutes but that she was only in the room with petitioner for about two hours and eleven minutes.

He then told the officers, "I think I wanted somebody to hurt as much as I did." When Officer Meeks asked him whether he wanted to shoot the victim, he replied, "Yeah, I did. I did want that bullet to hit her. I'm not going to lie to you."

Police officers later returned to the victim's apartment to collect additional evidence, including the exterior door. Again, the wreath was not collected from the door. Both Officers Meeks and Newlin testified that they did not collect the wreath because they did not believe it held evidentiary value. Officer Meeks testified, "[Petitioner] never brought [the wreath] up in our extensive interview. He never made mention of it. He never indicated there was anything on the door. It didn't stick out in his mind and, therefore, thus we decided to take the door as the primary piece."

Additional investigation into the Ruger pistol was performed. Officer Newlin testified that he contacted the manufacturer of the pistol and that "[t]hey responded to me and said that there were no recalls, defects, or anything of the nature that would cause that gun to fire with anything other than physically pulling the trigger." Respondent's firearm and toolmark expert testified that the Ruger pistol was subjected to impact testing and that, for it to fire, a finger or some object would have needed to pull the trigger. The expert further testified that "the shot into the entrance hole on the exterior of the door was fired at a distance somewhere greater than contact but less than 24 inches." When asked whether the wreath would have changed his conclusions with regard to his distance determination, the expert responded, "No, it would not have."

Before the case was submitted to the jury, petitioner requested that the trial court give an involuntary manslaughter instruction based on his theory that the gun accidently fired when the wreath struck his hand. The trial court denied the request, finding that no evidence had been produced to support petitioner's theory and that, without such evidence, petitioner was not entitled to the instruction.

After deliberating upon the verdict for approximately forty-eight minutes, the jury found petitioner guilty of first-degree murder and use or presentation of a firearm during the commission of a felony. The jury returned the next day to decide whether to recommend mercy.[2] Following the presentation of additional evidence by respondent, the jury deliberated upon its recommendation for thirty-four minutes, ultimately deciding not to recommend mercy. The trial court entered an order of conviction on September 24, 2020.

On October 3, 2020, petitioner filed a motion requesting either a new trial or judgment of acquittal. In the motion, petitioner argued that given the jury's short deliberation times, the jury decided the case based on sympathy or passion, rather than an objective review of the evidence, and that the trial court should have directed a verdict in favor of petitioner because no rational jury could have concluded beyond a reasonable doubt that petitioner intentionally tried to kill the victim. Respondent filed a response to the motion, arguing that the motion should be denied.

By order entered on November 13, 2020, the trial court denied the motion. With regard to

---

[2] Before trial, respondent filed a motion to bifurcate the trial to allow for a separate mercy phase, if applicable. The trial court granted the motion over petitioner's objection.

petitioner's argument concerning the length of the jury's deliberations, the trial court said:

> [Petitioner] then speculates, without any evidentiary support, as to the reason for the length of the deliberations. However, this is the type of intrinsic challenge that [State v. ]Scotchel[, 168 W. Va. 545, 285 S.E.2d 384 (1981),] and [State v. ]Jenner[, 236 W. Va. 406, 780 S.E.2d 762 (2015),] specifically preclude. Additionally, when viewing the argument on its merit, [petitioner] invites the [c]ourt to speculate on the cause for such deliberation because there is no actual evidence presented by [petitioner] to show jury misconduct. The [c]ourt considering this an intrinsic matter and, mindful that even if it were not there is a requirement clear and convincing evidence must be presented proving extrinsic misconduct, declines [to] engage in such speculation.

Regarding petitioner's argument that the jury could not have rationally concluded that petitioner intentionally killed the victim, the trial court found that the argument could be summarized as a challenge to the sufficiency of the evidence. The trial court concluded that, "[v]iewing the evidence in the light most favorable to the prosecution, there [was] sufficient evidence such that a reasonable jury could find that [] [petitioner] willfully, deliberately, intentionally and maliciously, with premeditation and deliberation did kill [the victim]."

On November 16, 2020, the trial court entered a sentencing order sentencing petitioner to consecutive sentences of life in the penitentiary without the possibility of parole for first-degree murder and ten years in the penitentiary for use or presentation of a firearm during the commission of a felony. Petitioner now appeals his conviction, arguing that he is entitled to judgment of acquittal or a new trial.

On appeal, petitioner asserts four assignments of error. In his first assignment of error, he contends that the jury reached its verdict in an unreasonably short period of time, which he argues indicates that the jury's decision was not based upon the evidence but was instead "the product of sympathy, passion[,] or extrinsic fear of being exposed to Covid-19." We observe that petitioner raised this issue in his post-trial motion requesting a new trial. We apply the following standard in reviewing a trial court's order denying a motion for a new trial:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

We have previously said that "the mere allegation of juror misconduct is insufficient to warrant a new trial." *State v. Trail*, 236 W. Va. 167, 175, 778 S.E.2d 616, 624 (2015). "'Misconduct on the part of the jury as grounds for a new trial is not presumed but must be fully proved by the moving party.' 58 Am. Jr. 2d *New Trial* § 143, at 195 (2012) (footnote omitted)."

*Trail*, 236 W. Va. at 175, 778 S.E.2d at 624. In Syllabus Point 1 of *State v. Scotchel*, 168 W. Va. 545, 285 S.E.2d 384 (1981), we held that "[a] jury verdict may not ordinarily be impeached based on matters that occur during the jury's deliberative process which matters relate to the manner or means the jury uses to arrive at its verdict." We further held that "[c]ourts recognize that a jury verdict may be impeached for matters of misconduct *extrinsic* to the jury's deliberative process." *Id.* at 545, 285 S.E.2d at 385, Syl. Pt. 2 (emphasis added). In *State v. Jenner*, 236 W. Va. 406, 780 S.E.2d 762 (2015), we stated that "a challenge to the length of jury deliberations constitutes an *intrinsic* challenge to a verdict that we will not entertain." *Id.* at 417, 780 S.E.2d at 773 (emphasis added).

In this instance, petitioner claims that the length of the jury's deliberations indicates misconduct and that COVID-19 acted as an extrinsic influence on the jury. We disagree with petitioner. First, petitioner has presented only a mere allegation of misconduct based solely on the length of the jury's deliberations. As we explained in *Trail*, the mere allegation of misconduct is insufficient to warrant a new trial. Petitioner has presented no proof, such as an affidavit from a juror, stating that COVID-19 affected the jury's deliberations. Rather, the trial transcript suggests that the jury was not influenced by COVID-19; it shows that potential jurors were informed of the protocols that would be employed to protect them from COVID-19 and no juror indicated that the protocols were inadequate, despite being invited to do so by the trial court. The length of the jury's deliberations, without more, does not indicate that the jury engaged in misconduct. As we made clear in *Jenner*, "[t]he length of jury deliberations is necessarily indeterminate. The brief period of deliberations . . . could signify that the jury found overwhelming evidence of guilt[.]" 236 W. Va. at 417, 780 S.E.2d at 773.

Regardless, any influence on the jury by COVID-19 would have been *intrinsic* to the jury's deliberations. *Scotchel* illustrates this point. In *Scotchel*, the defendant possessed an affidavit from a juror—referred to in that case as the "impeaching juror"—in which the impeaching juror affirmed that she wanted "to get the entire deliberations over as quickly as possible" because a fellow juror appeared ill. 168 W. Va. at 553, 285 S.E.2d at 390. The impeaching juror also stated that she was upset that the fellow "juror could not leave the jury room." *Id.* The Court determined that the issues raised by the impeaching juror were not impeachable by her affidavit because "the matter [] inheres in the jury's deliberative process." *Id.* In other words, the alleged misconduct—that the impeaching juror wanted to complete deliberations as quickly as possible because a fellow juror appeared ill—constituted an intrinsic challenge to the jury's verdict.

In applying our reasoning in *Scotchel* to petitioner's case, we conclude that even if petitioner possessed some proof above and beyond his mere allegation that COVID-19 affected the jury's deliberations, such as an affidavit from a juror stating that the deliberations were rushed over concerns of being exposed to COVID-19, petitioner would not be entitled to a new trial because the alleged misconduct would constitute an intrinsic challenge to the jury's verdict. Thus, petitioner's attempt to impeach the jury's verdict on this intrinsic matter fails under *Scotchel* and *Jenner*. Accordingly, we conclude that the circuit court did not abuse its discretion in determining

9

that petitioner was not entitled to a new trial on his claim that the length of the jury's deliberations indicates the jury engaged in misconduct.[3]

In his second assignment of error, petitioner argues that the trial court "committed plain and prejudicial error by denying [his] motion to suppress" the August 25, 2019, recorded interview. He asserts that the interview should have been suppressed because the process and tactics employed by Officers Meeks and Newlin in obtaining petitioner's inculpatory statements were "designed to take [] [p]etitioner on an emotional roller coaster fomenting both hope and despair" and because the officers made misstatements of law.

We have held that "'"'[a] trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence.' Syllabus Point 3, *State v. Vance,* 162 W.Va. 467, 250 S.E.2d 146 (1978)." Syl. pt. 7, *State v. Hickman,* 175 W.Va. 709, 338 S.E.2d 188 (1985).' Syllabus Point 2, *State v. Stewart,* 180 W.Va. 173, 375 S.E.2d 805 (1988)." Syl. Pt. 1, *State v. Farley*, 192 W. Va. 247, 452 S.E. 2d 50 (1994). We have further held that

> [t]his Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession is voluntary and whether the lower court applied the correct legal standard in making its determination. The holdings of prior West Virginia cases suggesting deference in this area continue, but that deference is limited to factual findings as opposed to legal conclusions.

*Id.* at 250, 452 S.E.2d at 53, Syl. Pt. 2. Accordingly, pursuant to these holdings, petitioner's claim that his statements were involuntary will be reviewed de novo, and we will give deference to the trial court's findings of fact. In reviewing the trial court's ruling on petitioner's motion to suppress, we are mindful that we must "construe all facts in the light most favorable to the State, as it was the prevailing party below." Syl. Pt. 3, in part, *State v. Jones*, 220 W. Va. 214, 640 S.E.2d 564 (2006).

We have held that, when the State expresses its intent to use a defendant's prior inculpatory statements against him at trial, "[t]he burden is on the State to prove by a preponderance of the evidence that [the] extrajudicial inculpatory statements were made voluntarily before the statements can be admitted into evidence against one charged with or suspected of the commission of a crime." Syl. Pt. 1, *State v. Bradshaw*, 193 W. Va. 519, 457 S.E.2d 456 (1995). "Whether an

---

[3] Petitioner also alleges that "it can be undoubtedly assumed that [the jury] based their decision . . . [upon] their own heated passions provoked by [respondent] in its closing arguments." Because petitioner has failed to develop this specific argument by setting forth "appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issue[] . . . [was] presented to the lower tribunal," we decline to address this argument. W. Va. R.A.P. 10(c)(7); *see also State, Dep't of Health & Human Res., Child Advocate Office v. Robert Morris N.*, 195 W. Va. 759, 765, 466 S. E.2d 827, 833 (1995) ("[A] skeletal 'argument', really nothing more than an assertion, does not preserve a claim." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))).

extrajudicial inculpatory statement is voluntary or the result of coercive police activity is a legal question to be determined from a review of the totality of the circumstances." *Id.* at 523, 457 S.E.2d at 460, Syl. Pt. 2. We have explained that,

> [i]n examining the totality of the circumstances, a court must consider a myriad of factors, including the defendant's age, intelligence, background and experience with the criminal justice system, the purpose and flagrancy of any police misconduct, [] the length of the interview[,] . . . [and the] moral and psychological pressures to confess emanating from official sources.

*Id.* at 527, 457 S.E.2d at 464; *see also State v. Sugg*, 193 W. Va. 388, 397, 456 S.E.2d 469, 478 (1995) (recognizing that "all the circumstances surrounding the interrogation" should be considered, including a suspect's "age, experience, education, background, and intelligence"); *State v. Persinger*, 169 W. Va. 121, 129, 286 S.E.2d 261, 267 (1982) ("[T]he voluntariness of a confession is an inquiry that must be gauged by the totality of the circumstances under which it was given including the background, experience and conduct of the accused."). "No one factor is determinative." *Farley*, 192 W. Va. at 250, 452 S.E.2d at 53, Syl. Pt. 7, in part.

Ultimately, "[w]hen evaluating the voluntariness of a confession, a determination must be made as to whether the defendant knowingly and intelligently waived his constitutional rights and whether the confession was the product of an essentially free and unconstrained choice by its maker." *Bradshaw*, 193 W. Va. at 523, 457 S.E.2d at 460, Syl. Pt. 7. Regarding a claim that misrepresentations by police officers warrants suppressing a statement, we have held that "'[m]isrepresentations made to a defendant or other deceptive practices by police officers will not necessarily invalidate a confession unless they are shown to have affected its voluntariness or reliability.' Syllabus Point 6, *State v. Worley,* 179 W.Va. 403, 369 S.E.2d 706 (1988)." *Farley*, 192 W. Va. at 250, 452 S.E.2d at 53, Syl. Pt. 6.

In applying our controlling precedent to this matter, we find no merit to petitioner's argument that the inculpatory statements he made to the officers were involuntary. Petitioner did not argue in his brief that the trial court's findings of fact—that petitioner was read his *Miranda* rights, that he was intelligent, that he was very familiar with the criminal justice system, and that the length of the interview was not unduly long—were plainly wrong or against the clear weight of the evidence. As these findings are uncontested in this appeal and are otherwise supported by the appendix record, we conclude that the trial court's findings were not plainly wrong or against the clear weight of the evidence. In addition, we find that petitioner was twenty-eight years old at the time of the shooting—a decade over the age of majority. Although petitioner argues that the discussion concerning federal sentencing procedures affected the voluntariness of his statements to the officers, we find that the discussion was not extensive, and petitioner did not make inculpatory statements directly following the discussion, indicating that the discussion did not entice petitioner to make his inculpatory statements. Additionally, we find that Officer Meeks's implication that petitioner might not spend the rest of his life in prison if he took responsibility for his actions did not constitute a misrepresentation in that, if petitioner had entered a plea of guilty to first-degree murder, the trial court may have ultimately looked favorably upon any such cooperation and ordered that petitioner receive mercy. *See* W. Va. Code § 62-3-15, in part ("[I]f

the accused pleads guilty of murder of the first degree, the court may, in its discretion, provide that such person shall be eligible for parole[.]").

In light of these findings, we conclude that the interview was not calculated to foment both hope and despair in petitioner to the extent that his statements were rendered involuntary. Under the totality of the circumstances, we conclude, as did the circuit court, that the statements made by petitioner during the interview were voluntary and that they were not the result of coercive police activity. Consequently, we determine that the trial court did not err in denying petitioner's motion to suppress.

In petitioner's third assignment of error, he claims that the trial court "committed plain and prejudicial error by refusing to give [his] jury instruction for involuntary manslaughter." In support of this contention, petitioner argues that he was entitled to an involuntary manslaughter instruction because "there was ample evidence presented to support his theory of the case and his argument that the sudden slamming of the door with the lo[o]se wreath hanging on it, into his hand, which was holding and wielding the gun, caused the unintentional discharge of his gun."

We note that the entirety of petitioner's argument as to this assignment of error is comprised of only five sentences. In those five sentences, petitioner does not provide the applicable standard of review, nor does he provide a single citation to the appendix record, such as a citation pinpointing when and how this issue was presented to the trial court. Furthermore, petitioner's only citation to legal authority—a case defining the offense of involuntary manslaughter— provides this Court with no guidance in determining whether petitioner was indeed entitled to the requested instruction.

Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure requires that a petitioner's brief

> contain an argument exhibiting clearly the points of fact and law presented, the standard of review applicable, and citing the authorities relied on . . . . The argument must contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal. The Court may disregard errors that are not adequately supported by specific references to the record on appeal.

Additionally, we have said that "[a]lthough we liberally construe briefs in determining issues presented for review, issues which are . . . mentioned only in passing but [which] are not supported with pertinent authority, are not considered on appeal." *Meadows v. Mutter*, 243 W. Va. 211, 230, 842 S.E.2d 764, 783 (2020) (quoting *State v. LaRock*, 196 W. Va. 294, 302, 470 S.E.2d 613, 621 (1996)). Because the discussion accompanying petitioner's third assignment of error is not adequately supported by specific references to the record on appeal and pertinent authority, we decline to address it.

Finally, in petitioner's fourth assignment of error, he argues that the trial court erred by denying his motion for acquittal on the ground that the jury's verdict was contrary to the evidence presented. Petitioner argues that, under *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995),

"[n]o rational jury could conclude beyond a reasonable doubt that [] [p]etitoner intentionally tried to kill the victim." He asserts that, at trial, he "clearly demonstrated that the slamming of the door and wreath into [] [p]etitioner's right hand, in which he held the firearm, caused the demise of the decedent." He further states that "[t]he door slamming into his hand was an unexpected intervening cause requiring [] [p]etitioner to re-evaluate his decision to kill, if it ever existed in the first instance for first[-]degree murder to attach." In summary, petitioner argues that the evidence was insufficient to support his conviction.

Again, petitioner has failed to include the applicable standard of review or a single citation to the appendix record in this argument; however, petitioner has included citations to relevant law such that we may proceed to consider the issue. As this issue was first raised below in petitioner's post-trial motion for judgment of acquittal, we review the issue de novo. *See State v. Juntilla*, 227 W. Va. 492, 497, 711 S.E.2d 562, 567 (2011) ("The Court applies a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence." (citing *LaRock*, 196 W. Va. at 304, 470 S.E.2d at 623). We have held that

> [t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

*Guthrie*, 194 W. Va. at 663, 461 S.E.2d at 169, Syl. Pt. 1. We have further held,

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id.* at Syl. Pt. 3, in part.

In applying *Guthrie* to this assignment of error, we conclude that petitioner is entitled to no relief. In his statements to police, petitioner was clear that the victim had "triggered" him and "set [him] off." He told police he threatened to shoot the victim in response to the behavior that he claimed set him off, that he pointed the gun at her face, and that when he shot the victim, he "want[ed] that bullet to hit her." Additionally, the testimony of Officer Newlin revealed that "there were no recalls, defects, or anything of the nature that would cause that gun to fire with anything other than physically pulling the trigger." Respondent's firearm and toolmark expert also testified

that for the gun to have fired, a finger or some object would have needed to pull the trigger. We determine that, after viewing this evidence in the light most favorable to the prosecution, the jury could have found the essential elements of the crimes with which petitioner was charged proved beyond a reasonable doubt. Therefore, we conclude that the trial court did not err in denying petitioner's motion for judgment of acquittal.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** January 12, 2022

**CONCURRED IN BY:**

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins
Justice William R. Wooton

14